## JONES v. GOULD STEAMSHIP & INDUSTRIALS, Limited, et al.

### (District Court, D. Maryland.  July 22, 1924.)

Shipping ⬦⟹84(3)—Ship held not liable for injury to stevedore by falling through a trimmer's hatchway.

> Injury to a stevedore superintendent, in charge of discharging a coal cargo from the hold and between-decks, by falling through a trimmer's hatch while walking in the between-decks in the dark, without a lantern, *held* not due to any negligence of the ship which rendered it liable; the location of the hatch not being unusual, and its size, while somewhat larger than usual, not being so extraordinary as to constitute negligent construction, and its being uncovered to be expected under the circumstances.

In Admiralty.  Suit by Charles F. Jones against the Gould Steamship & Industrials, Limited, and the Terminal Shipping Company.  Decree for respondents.

Edwin W. Wells and George Forbes, both of Baltimore, Md., for libelant.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, and Janney, Ober, Slingluff & Williams, of Baltimore, Md., for respondents.

SOPER, District Judge.  There is no material dispute as to the manner in which the accident occurred.  The libelant at the time was the foreman in charge of the work of discharging a cargo of coal from the steamship, and had been so engaged for two or three days prior to the accident.  Although he had charge of the work, and a part of the work was discharging the coal from the space between-decks, he had not been in this space before the accident, but had contented himself with supervising the work of discharge from the deck.

On the night in question, the work had been going on between-decks from 7 to 11 o'clock, was resumed after the intervening supper hour, and later, about 1 o'clock, the libelant went down the ladder to give some directions as to the work between hatches 2 and 3, or near No. 3 hatch.  It was dark, and the space between-decks was poorly lighted, as testified by all the libelant's witnesses, and by the libelant himself, who said that, when he went down into the space, he needed a lantern or light, but did not provide himself with one.  As he walked across the space aft from No. 2 hatch between-decks, he fell into an opening which has been described as a trimming or feeder hatch, and was severely injured.

There is some difference in the statement of facts between the libelant on the one side and the officers, the mate and captain and steward, of the vessel, whose depositions have been put in evidence, on the other.  It does not seem to me, however, that the difference in statements is of any particular importance in the decision of the case.  The points which the respondents would emphasize in regard to them are, first, that the libelant had had warning that there were trimmers' hatches in the between-decks; and, secondly, that he had been fur-

nished with a lantern. Whether or not he received such warning, or was offered such a light, does not seem to me to be of importance in the decision, because it is clear from the statement of the libelant himself that he knew that he needed a light if he were to see where he was going, and because as an experienced stevedore he must have known that there were trimmers' hatches in the between-decks, whether in this particular place or another. The deposition of the mate is to the effect that he told the libelant to beware of the trimmers' hatches, but did not warn him of their location or size. I think, therefore, the testimony of the respondent on that point does not tend to throw any light on the case. Whatever information the libelant would have gotten, had the conversations taken place, he already had from his general knowledge of ships as a superintendent stevedore, so far as trimmers' hatches are concerned, and from his own observation that the place was very dark into which he descended.

As I understand the position of the libelant, he claims that he has the right to recover because the hatch through which he fell was not placed where one would naturally expect it to be, and because it was of an unusual size and was not covered or protected in any way at the time of the accident. Now, first, as to the location: There is expert testimony on both sides, the testimony of three witnesses for the libelant and three for the respondent, and from that testimony I conclude that, so far as the location of the hatch is concerned, there was nothing so unusual about it as to place liability upon the respondent. Indeed, one of the libelant's own expert witnesses testified that the location was not improper or unusual for a trimmers' hatch. It appears that the No. 3 hatch was divided athwartships by a steel or wooden bulkhead, which shut off the trimmers' hatches in the after part of No. 3. Therefore additional openings between No. 2 and No. 3 hatches were necessary and useful, in order to permit the trimming of cargo and the escape of the stevedores, who were stowing the cargo both in the forward part of No. 3 and in No. 2. Certainly the position of the trimmers' hatch through which libelant fell, as shown on the drawings submitted to the court, was such as would be most useful to serve both hatches. In addition to the testimony on the part of the libelant, so far as one of his witnesses is concerned, that the location of the trimmers' hatches was not unusual, there is also testimony of one other of his witnesses that, where a division of the No. 3 hatch is found, some additional openings are necessary.

Now, then, as to the size of the opening, which was 4 feet square: The testimony on the part of most of the witnesses, expert and other, is that trimmers' hatches are usually 2 feet square, or 30 inches square, although in some instances they are 30 inches one way and 4 feet another. The conclusion I have come to, so far as the size of the hatch is concerned, is that, although the particular hatch through which the libelant fell is somewhat larger than most trimmers' hatches, it is nevertheless not larger than some other trimmers' hatches. I am not able to reach the conclusion that a stevedore has the right to expect a trimmers' hatch to be of a particular standard opening, or to be surprised if he finds one 4 feet by 4 feet, instead of one 30 inches by 30 inches, or 30 inches by 4 feet. In other words, I cannot conclude from

the testimony that there was an unsafe construction of the ship arising from the location or size of the trimmers' hatches.

Now it is said, however, in addition to these questions of place and size, that the hatches should have been covered, and that the leaving of them uncovered was negligence on the part of the ship. The testimony of the libelant's witnesses seems to me to answer that argument. There is no doubt that both the lower hold and the between-decks were used for the stowage of coal. The stevedores, under the supervision of the libelant, first removed the coal from the lower hold, and afterward, beginning at 7 o'clock p. m. on the night of the accident, entered the between-decks to the coal, which at that time was at a considerable depth all over the between-decks in the neighborhood of hatches No. 2 and No. 3, and in the neighborhood of the various trimmers' hatches within this space, including the hatch through which the libelant fell.

There was nothing improper or unusual or unexpected in the stowing of cargo in this fashion. If the trimmers' hatches were to be used at all, and if the cargo was to be stowed in the lower hold and also in the between-decks, the trimmers' hatches had to be left open. They would serve no purpose if they were not left open. When the vessel was turned over to the stevedore for discharge, the coal filled, not only the lower hold, but the between-decks, and of course filled up these openings. Now the stevedores descend to the between-decks to remove the coal. When they go down there they must necessarily come in contact with the openings. It is a matter of practice, which must be known to them and known to the foreman stevedore. The coal, which filled up the openings, had by that time disappeared through the discharge of the coal in the lower hold. It was the work of the stevedores, under the supervision of the libelant, in the removal of the coal which opened up the trimmers' hatches and made them dangerous, and as the ship was entirely in their charge at the time, under the supervision of the foreman, if there was any necessity or duty to cover the openings, the duty was on the libelant himself.

It is also suggested that this hatch was improperly constructed, because there was no coaming of the standard or required type, 3½ inches high, surrounding it. It is a difficult issue of fact for the court to determine whether there was or was not coaming there. So far as the actual testimony goes of the people who say that they saw the place, and can testify from actual knowledge, the evidence is all one way that there was no coaming. The only evidence to indicate that there was coaming is the fact that the ship had been surveyed and passed, and the opinion of an expert witness was that it could not have been passed, had there not been coaming. It does not seem to be necessary to determine whether there was or was not coaming, because the purpose of the coaming and its effect was merely to strengthen the ship, and not protect people from falling into the hold. Indeed, I fancy that, if there were an obligation owing by the ship to the libelant for falling into this place, the libelant would be the last one to admit that a sufficient protection had been afforded, if a 3-inch coaming surrounded the hold. I think it is quite impossible to say that the evidence tends to

show that, had there been coaming there, the accident would not have happened.

A man moving along in the dark and meeting a 3½-inch obstruction in the deck would have been much more likely to have gone head first into this hole than to have saved himself. Furthermore, there is no reason to believe that the deck was so clean that the coaming, if present, would have projected 3½ inches from the surface upon which a man would walk as he approached the hatch. Counsel for libelant states that in his opinion the coal had not been removed in the neighborhood of the hatch into which the libelant fell. In that opinion he is supported by the testimony of two important witnesses, stevedores, who testified that, although they were working within 6 feet of it, they had not seen it. But, if the coal had not been removed from the neighborhood of the hatch, coaming would have afforded no protection. There is also testimony in the case, on the part of one of the witnesses, that the deck was covered with 2 or 3 inches of coal, which would seem to me to be borne out by the evidence, since the work had not been completed, and they were shoveling up the coal and putting it into buckets.

The libelant rests upon the statement of law which is found in Hughes on Admiralty, p. 211, to the effect that, so far as workmen upon a vessel, like stevedores, are concerned, it is not negligence to leave a hatchway open; that such men are supposed to be familiar with the construction of a ship, and to know that hatchways are necessary structures, and are made to be left open for the purposes of loading. If, therefore, the construction of a ship and its hatchways is proper, and there is no defect about them, as could be discernible by the exercise of ordinary care, the fact that they are left open would not give a right of action against the ship, unless they were left open at a point where the laborers on the ship would not naturally expect to find them open, and had no rail or guard or rope around them that would likely indicate their existence.

The conclusion to which I have come is that, on the facts of the case, the construction of the hatchways was proper, that they served a useful purpose, and that, whilst they were somewhat larger than usual, neither in their size nor location were they so unusual or extraordinary as of themselves to constitute negligent construction of the ship, giving a right of action for an accident of this kind. I cannot find from the evidence that the hatches were left open at a point where the foreman stevedore would not naturally expect to find them. On the contrary, my conclusion from the evidence is that, when he entered the between-deck space, he naturally would have expected to find all of the trimmers' hatches open; and, furthermore, the variety in the construction of vessels and the placing of the hatches is sufficiently great to impose upon one who is in the stevedore business, working in the loading or discharging of a ship, the duty of proceeding carefully in a dark space of this kind, so as to make certain where the openings are which he may expect to find.

For these reasons, while of course, in common with all of us, I deeply regret the serious and permanent injury to the libelant, I cannot find that it was occasioned by any fault of the ship.

The libel will be dismissed.