## HOLLIDAY v. PACIFIC ATLANTIC S. S. CO.

### No. 1582.

United States District Court,
D. Delaware.

July 9, 1951.

---

Henry A. Wise, Jr., Wilmington, Del., Abraham E. Freedman, Freedman, Landy & Lorry and Howard M. Long, Philadelphia, Pa., for libellant.

William Prickett, Wilmington, Del., Thomas E. Byrne, Jr., Robert Cox and Krusen, Evans & Shaw, Philadelphia, Pa., for respondent.

RODNEY, District Judge.

This suit was instituted under the Jones Act, 46 U.S.C.A. § 688, by Florence G. Holliday, as the administratrix of the estate of Clinton O. Holliday, to recover damages for his death.

The libel alleges that the respondent owned, operated and controlled the S. S. Peter Kerr; that in February, 1942, Holliday was in the employ of the respondent as a member of the crew of the Peter Kerr, in the capacity of a chef on a foreign voyage from the east coast of the United States to South Africa and return; and that on or about February 4, 1942, the decedent was in the ice box of the vessel when some wires which were protruding from a box or package punctured his leg and foot. It is further alleged that the respondent failed to provide proper medical care to the decedent, as a result of which his condition became aggravated and death ensued.

Respondent is charged with disregarding its duty to the decedent and with negligence in that it failed to provide a safe place to work and also failed to provide proper and adequate medical care.

The answer of the respondent denies the happening of the accident in the ice-box and the failure to provide a safe place to work and to provide proper medical care. Furthermore, it avers that if Holliday sustained any injury in the ice box or chill room in the manner alleged by the libellant, Holliday was guilty of contributory negligence in that it was his duty to keep the ice box in proper condition.

Trial was had in this case in November, 1947. However, applications for the taking of further testimony were made at and after the conclusion of the trial, resulting in a delay in the final termination of the proceedings until April, 1951.

There is considerable conflict in the testimony of the witnesses, and there is some dispute as to the principles of law to be applied. I shall first address myself to the factual issues and discuss the legal issues after indicating my conclusions as to the facts.

Clinton O. Holliday was an American merchant seaman. He was engaged by the respondent, in November, 1941, to serve as chief cook on the S. S. Peter Kerr, which was to sail from New York to certain South and East African ports and return. He was married to the libellant and was, superficially at least, in good health when he embarked on the ship.

The Peter Kerr sailed from New York on November 11, 1941. She proceeded to Trinidad, thence to Cape Town, and from that point to other ports in South and East Africa, going apparently as far as Lourenco Marques. On the return journey, she touched at Port Elizabeth on February 2, 1942, and leaving there on February 5, 1942, reached Cape Town on the evening of February 7, 1942. There the vessel first anchored off shore and then moved in to dock the next morning. At that time Holliday was suffering from a severely swollen left leg and was confined to his quarters. Almost immediately after

the ship docked at Cape Town, a doctor, Dr. Shapiro, was summoned. He came on board, examined Holliday and directed his prompt removal to hospital on shore. The doctor's diagnosis was that Holliday was suffering from blood poisoning. Apparently Holliday was delirious at the time. After his removal to the hospital his condition became gradually worse and death followed on February 18, 1942. The cause of death stated on the death certificate was: "Septicæmia, cellulitis of left foot and leg, nephritis, acute cardiac failure." Such are the basic and virtually uncontroverted facts of the case. The factual dispute between the parties is concerned with the origin of Holliday's condition and the nature and extent of the medical care and attention afforded him.

The libellant introduced evidence to to prove that what happened to Holliday was this. On or about February 1, 1942, while the vessel was on its return journey from Durban to Port Elizabeth, Holliday, in the company of another member of the steward's department, named Cooper, went into the ship's ice box in order to obtain supplies for the next day's meals. Cooper was the officers' messman and also a "ship's delegate." In the latter capacity it was his function to report grievances or complaints of members of his department to the ship's officers. The ice box was stocked with provisions and had in it boxes and packages piled or stacked so that there was little free room for movement. The lighting in the ice box was dim. While the two men were in there, Holliday's left leg came into contact with some wires which were protruding out of a box, several inches above the level of the deck. The wires cut into his leg or ankle, causing it to bleed. At Cooper's suggestion Holliday put some ice on the cut and left the ice-box. Later that day Cooper reported the injury to the second mate. The second mate was the officer responsible for the administration of first aid and medical attention on board ship. He gave Cooper some lotion to put on the wound and this lotion apparently was used by Holliday.

Cooper testified that on the next day, which was the day on which the Peter Kerr reached Port Elizabeth, Holliday went to work in the morning, as usual. However, the condition of his leg, which was swollen, had become so bad and he complained so much of pain that Cooper advised him to return to his quarters. At about midday Cooper reported the matter to the chief mate. Subsequently the captain and the chief mate went to Holliday's quarters and examined him. The captain allegedly told him that the ship was leaving that night and that he would have to wait until they reached Cape Town before they could procure a doctor for him.

According to Cooper's testimony, he saw no doctor come on board to examine Holliday at Port Elizabeth, and nothing was done for Holliday between Port Elizabeth and Cape Town. It was testified that Holliday was unable to return to work during that time. It is alleged that his leg was "sore with pus on the side" and that he was in a more or less delirious condition even while the ship was at Port Elizabeth.

When the ship arrived at Cape Town there was some delay before docking. However, Dr. Shapiro came on board very soon after the vessel docked, examined Holliday and ordered his immediate removal to the hospital. Holliday's condition at that time was, according to the evidence submitted by the libellant, even worse than when the ship left Port Elizabeth.

Cooper testified that Holliday had no sores or wounds on his leg before the accident in the ice box; and the libellant, Holliday's wife, testified that he had no such sores or wounds immediately before he sailed from New York. Dr. Shapiro's testimony, which was taken by deposition upon written interrogatories after the close of the trial in court, confirmed that he examined Holliday at Cape Town and ordered his immediate removal to the hospital. He also confirmed that the condition of Holliday's left leg was severely aggravated; that it was intensely swollen, and that Holliday was suffering from cellulitis and septicæmia and was delirious. Dr. Shapiro gave it as his opinion that Holliday's condition could have been caused by the accident in the ice box, as it

was described by Cooper; that it was possible that severe cellulitis might have developed between February 5 and February 8, 1942, but that such development was unlikely in view of the testimony that Holliday's leg was sore and pussy on February 2, having regard to the fact that only some sixty-odd hours elapsed between the departure of the vessel from Port Elizabeth and its docking at Cape Town.

That is the libellant's version of the facts. The respondent, on the other hand, sought to prove that Holliday had sores and wounds on his legs long before the ship reached South Africa; that the second mate then prescribed treatment for them which Holliday failed to follow; that Holliday himself said that he had had these sores for a long time and that they would not heal properly; that no accident such as was described by Cooper was reported to the ship's officers; that Holliday was examined by a Dr. Bester on board ship at Port Elizabeth on February 5, 1942, and some medicine was prescribed and obtained for him; that it was after the vessel had left Port Elizabeth and was well on its way to Cape Town that Holliday's condition became aggravated or serious, and that medical assistance was procured at Cape Town as soon as possible. More specifically, the captain of the ship testified that Holliday worked the day after they left Port Elizabeth and that it was on February 6 that he examined Holliday at the request of the second mate and at that time saw that his leg had sores and scars on it, but that it was not noticeably worse than when he had examined Holliday on earlier occasions. The captain testified that he had seen the same or similar sores and scars on Holliday's legs when the latter came to him for medical treatment not long after the vessel had sailed from New York. When the ship reached Cape Town the second officer told the captain that Holliday had gone to bed with swollen legs, so the captain examined him again and sent for a doctor for Holliday, as well as for several other members of the crew. The captain further testified that he did not turn back to Port Elizabeth after examining Holliday on February 6, because he did not consider his condition sufficiently serious to warrant such a course of action.

The testimony of the second officer largely substantiated that of the captain. It brought into the case, however, a significant factor not mentioned by the captain, namely, that Holliday had been examined by Dr. Bester on board ship at Port Elizabeth on February 5, 1942. For what complaint Dr. Bester saw Holliday and what Dr. Bester's diagnosis of his condition was, is far from clear. It would appear that Dr. Bester's examination of Holliday may have been occasioned by the condition of Holliday's leg or legs. There is no evidence that Dr. Bester recommended or did not recommend Holliday's removal from the ship. Nor is it possible to ascertain from the evidence with any degree of certainy what treatment Dr. Bester ordered. Apparently he made out a prescription for some medicine which was subsequently obtained for Holliday and which was in the form of pills.

In weighing the evidence, I have attempted to reconcile discrepancies as far as possible. Some, however, are irreconcilable. It is clear that Cooper, the libellant's principal witness, was mistaken on some points. For instance, he seems to have thought when he testified that the Peter Kerr remained at Port Elizabeth only overnight on her return journey, whereas the ship's log and other evidence indicates almost conclusively that the vessel remained there from February 2 to February 5. However, I do not consider such an inaccuracy (assuming it to be one) to invalidate his testimony in all its aspects. Cooper gave his evidence some five years after the event and some inaccuracies or misconceptions were to be expected. I accept Cooper's testimony that the accident happened to Holliday's foot and leg in the vessel's ice box or chill room substantially as was related by him. I think that it is reasonably clear that something happened to Holliday (more particularly, to his leg) when the vessel was approaching or perhaps was already at Port Elizabeth, and there is no reason to suppose that the injury was not incurred in

the way described by Cooper. This does not mean, of course, that the respondent's witnesses were necessarily incorrect when they testified that Holliday already had scars and sores on his legs long before the vessel reached South Africa.

■ I am, therefore, prepared to find as a fact that Holliday's leg and ankle were cut and injured by wires protruding from a box in the ice box or chill room on the vessel. I am also prepared to find that that injury may have been a competent producing cause of Holliday's subsequent death.

■■ As to the medical care and treatment accorded Holliday, I am of the opinion that it is sufficiently established that Holliday was seen by Dr. Bester on board ship, before the vessel departed for Cape Town. If Holliday's condition had at that time been such as was described by Cooper (that Holliday was more or less delirious and his leg "sore and pussy"), it is not to be presumed that it would have escaped Dr. Bester's attention and that the doctor would not have ordered more specific treatment. From the testimony it is not clear that the attention of Dr. Bester was called to the condition of Holliday's leg or that he was called to see Holliday for that purpose; it seems possible that Dr. Bester's attention was called simply to some stomach trouble of which Holliday had been complaining. My conclusion, therefore, is that when Holliday was seen by Dr. Bester at Port Elizabeth, the condition of his leg was not in that serious condition stated by Cooper. His condition seems to have been such that it was not deemed necessary by Dr. Bester to order his removal from the ship or to do anything other than to prescribe medicine which the patient could administer to himself on board ship. It is true that Dr. Shapiro stated that it was unlikely that Holliday's condition, as he saw it, could have developed between February 5 and February 8, but this statement was predicated in part upon the assumption that it was a fact that Holliday's leg was "sore and pussy" on February 2. In my opinion, that was not established as a fact and must be regarded as probably erroneous.

Further, I am unable to accept the testimony introduced on libellant's behalf to the effect that no care or treatment was afforded Holliday on the voyage from Port Elizabeth to Cape Town. Indeed, other parts of Cooper's testimony negatives this assertion, and I think indicates that Holliday was examined several times by officers of the ship during the short passage from Port Elizabeth to Cape Town and that efforts were made to treat him. In short, I am of the opinion that there is no sufficient evidence of a failure to afford Holliday proper and adequate medical care or of any negligence in that regard. It is probable that Holliday's condition became serious at some point between Port Elizabeth and Cape Town, but I am unable to find either that there was a negligent failure to turn back to Port Elizabeth, or that Holliday's condition became visibly and clearly dangerous at a time when the ship was still near enough Port Elizabeth to have made a return to that port a proper and required course of action. There was no doctor on the ship and, while the officers of the ship may have had some rudimentary medical training, I find no basis for concluding that they failed in a duty to afford Holliday such proper medical care as was available.

From the determination which I have made with regard to the question of the medical care afforded Holliday, it necessarily follows that no legal liability on the part of the respondent could arise in that connection, irrespective of whether the obligation to render medical care was absolute or was based upon a duty to use reasonable care.

The question remains whether the respondent can be liable by reason of the injury having been caused by the protruding wires. Can that injury, and the ensuing death, be attributed to respondent's negligence? Did it result from the unseaworthiness of the vessel so as to give rise to liability, irrespective of negligence?

■ There is no direct evidence to show how or why the wires were protruding from a box or package in the ice box; there is nothing to indicate that that con-

dition was caused by any negligence on the part of any of respondent's officers or employees, or that it had existed for any length of time or that the ship's officers knew of it. It would be pure surmise or guesswork to say that the condition in question was caused by negligence or that there was a negligent failure to remove it. In short, I conclude that there can be no liability on respondent's part for the allegedly unsafe condition by reason of negligence.

 But even if there were no negligence, there is the question whether the existence of the so-called unsafe condition did not amount to unseaworthiness, for which the respondent would be absolutely liable, without regard to any question of negligence.[1] That the duty of the owner to provide and maintain a seaworthy ship is an absolute one, is well settled. It seems also to be clear that if a ship or her gear is not safe for use, the ship is not seaworthy.[2] However, a distinction has been drawn between an inherently unseaworthy condition of a ship and a transitorily unsafe condition existing on a ship. Thus in Cookingham v. United States, 184 F.2d 213, certiorari denied 340 U.S. 935, 71 S.Ct. 475, decided by the Court of Appeals for this Circuit in 1950, it was held that the presence of a slippery substance on a stairway leading to the chill box on a ship did not render the vessel "unseaworthy," but amounted, at most, to a transitorily unsafe condition, for which there could be no absolute liability. Although Judge Biggs dissented vigorously from the conclusion reached by the majority, that conclusion must be accepted as laying down the rule for this circuit, and is, I think, applicable here.

▮ The ice box or chill room on the Peter Kerr on the occasion in question was not itself, as far as can be ascertained from the evidence, in an unsound con-

dition. What rendered movement in it temporarily unsafe was the presence in it of a box or boxes with wires protruding from them. This, under the rule of the Cookingham case, did not amount to unseaworthiness of the vessel.

I therefore conclude that the respondent cannot be held to be legally liable for the death of Holliday, and that libellant cannot recover the damages herein sought. It may well be regarded as regrettable that the seaman's widow is not entitled to compensation for his death, but as has often been observed, the remedy for this and similar situations lies rather with the legislature than with the courts.

Findings of fact and conclusions of law are filed contemporaneously with this opinion. An order in accordance therewith may be submitted.

---

1. For purposes of this discussion, I have assumed that, under the Jones Act, there can be recovery for a seaman's death by reason of unseaworthiness, irrespective of "negligence;" see Cortes v. Baltimore Insular Line, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368, and The G. W. Glenn,

D.C., 4 F.Supp. 727. The respondent has contended that there can be no such liability.

2. See Cookingham v. U. S., 3 Cir., 184 F. 2d 213 (majority and dissenting opinions).