**William S. McMAHAN and James McMahan, Libelants,**

v.

**THE PANAMOLGA, her engines, boilers, etc., and Compania Naviera Dalmatica, S.A., Respondent.**

**No. 3505.**

United States District Court, D. Maryland, Admiralty Division.

Jan. 20, 1955.

Emile Z. Berman, New York City, and William J. O'Donnell, Baltimore, Md., for libelants.

Ober, Willams, Grimes & Stinson, Baltimore, Md. (Southgate L. Morison and Randall C. Coleman, Jr., Baltimore, Md.), for respondents.

THOMSEN, District Judge.

Libelants, employed by Gulf-Tide Stevedores, Inc., to help load grain on the S.S. Panamolga in Galveston, Texas, were made ill by inhaling fumes of carbon disulfide, which had been used to fumigate the grain which was being loaded. They have filed a libel in rem against the ship and in personam against its owner and operator, claiming permanent injuries, and alleging unseaworthiness, failure to warn, and failure to provide a safe place in which to work. Respondents deny that the ship was unseaworthy, and deny that they violated any other duty which they owed to libelants.

### Findings of Fact

The Panamolga is an American Liberty Ship of Panamanian registry owned by Compania Naviera Dalmatica, S. A., a Panamanian corporation. As with other Liberty ships, in the No. 1 (forward) hold there is a 'tween deck below the main or weather deck; below the 'tween deck is the lower hold; the bottom of the lower hold is the ceiling or top of the four deep tanks which lie between the lower hold and the vessel's double bottom. The bottom of the lower hold was referred to by some of the witnesses as the lower 'tween deck. The four deep tanks in the No. 1 hold, two starboard and two port, are separated from each other by bulkheads. We are concerned in this case with the No. 2 (afterport) deep tank in the No. 1 hold, which I will generally refer to as the deep tank. The deep tank measures about 30 ft. by 30 ft., and is 9 ft. deep. There is an 8 ft. by 15 ft. rectangular opening in the top, in the forward starboard corner of the deep tank, which furnishes its only means of ventilation. A ladder runs down from this opening into the deep tank. Liberty ships have no forced ventilation, and I find that very few grain ships touching at Galveston had any forced ventilation in the grain-carrying compartments.

In the latter part of October, 1950, the Panamolga was under voyage charter to the President of India, the owner and shipper of the milo (a grain sorghum) which was to be loaded on the vessel. The Panamolga discharged lumber and general cargo on the east coast in the early part of October, 1950, and sailed in ballast for Galveston. During the voyage the ship's crew, under the supervision of Chief Officer Joseph Ivellio, swept and washed with fresh water all cargo spaces. No chemical was used and no noxious fumes were noticed. The vessel had not been fumigated since 1947, but had a valid rat certificate and extension.

The Panamolga arrived in Galveston on the early morning of October 24, 1950. Grain fittings, called shifting boards, were erected in the lower holds, but not in the deep tanks. The vessel berthed at a pier adjacent to Galveston Wharves Grain Elevator B, from which the grain was to be loaded. The elevator is owned by the City of Galveston.

The capacity of the elevator is about 5,500,000 bushels. It is constructed in a series of bins, each of which is a separate storage unit by itself. There are over 400 bins in the elevator, varying in size from about 5,000 to 32,000 bushels capacity. A standard railway car carries about 1,500 to 1,800 bushels.

When ships are being loaded, grain is carried by conveyor belts from the bottom of a number of separate bins to a higher loading bin, where the grain from the separate bins becomes mixed. A spout carries the grain from the loading

bin to a point over the weather deck level of the hold into which it is to be loaded. Feeders, called troughs by one of the witnesses, then carry the grain to the opening of the deep tank or other space to be loaded with grain.

Before grain may be loaded, the deep tanks and other cargo spaces which are to receive it must be passed by an inspector from the Galveston Cotton Exchange and Board of Trade Grain Department (Board of Trade) and by a surveyor from the National Cargo Bureau, Inc., formerly known as the Board of Underwriters of New York (Board of Underwriters). The Board of Underwriters also issues a certificate of loading following a second inspection after the loading is completed. The inspectors of the Board of Trade are licensed and supervised by the United States Department of Agriculture.

On October 24, 1950, an inspector from the Board of Trade came on board the vessel and inspected and passed all holds. On October 25, 1950, a surveyor from the Board of Underwriters inspected all holds and deep tanks. He passed all holds as ready to load grain except No. 3, in which the grain fittings had not been completed. He returned early the following morning and passed No. 3 hold. The superintendent of Gulf-Tide Stevedores, Inc., (Stevedore), the employer of the two libelants, inspected the vessel prior to loading. One or more of the vessel's officers were present when these inspections were made.

On October 25, about 7 P.M., Stevedore's employees came aboard the ship and ran grain from 7:20 P.M. to 9:25 P.M., during which period 168,000 bushels were loaded into holds 1, 2, 4 and 5. The No. 2 deep tank in the No. 1 hold was filled to a point where the apex of the pyramid of grain was at or a little above the level of the top of the deep tank.

The loading of the grain is the stevedore's responsibility. In effect, the ship is turned over to the stevedore for that purpose. The stevedore foreman, called a walking foreman, moves about from ship to shore but is usually to be found on the weather deck. A spout man, employed by the stevedore, moves the spout from place to place as needed and starts and stops the flow of grain from the loading bin of the elevator through the spout.

Samplers, employed by the Board of Trade, take samples of the grain flowing out of the spout every 8,000 bushels. The samples are caught in a device known as a pelican, and are sent at once to a laboratory located in the elevator, where they are tested for grade by the Board of Trade inspector. Any offensive odor would affect the grade and, if present in any unusual degree, should be, and I find as a fact would have been, discovered by the Board of Trade inspector.

The first officer of the ship is usually the officer on duty during loading, and I find as a fact that he was present on the evening of October 25 while grain was being run, and on the morning of October 26 until after libelants became sick. It is customary for such officer to sample grain as it flows from the spout by taking occasional handfuls to see whether it is wet or hot. I find that the first officer took a few such handfuls on the evening of October 25, that he did not find it hot or wet, and that he did not notice any unusual odor, although it is doubtful whether the presence of dangerous quantities of carbon disulfide in the grain would be noticeable from such an examination.

Between 9:30 and 10:00 P. M. on October 25, Stevedore's employees knocked off work, put hatch covers on the No. 1 hold at the weather deck level and left the ship. There is no evidence that anyone noticed anything unusual about the grain which was loaded that evening.

Early on the morning of October 26 libelants, who had been working as longshoremen for some months, went to the waterfront for the shape-up. A walking foreman, who works for a number of stevedoring companies, picked up libel-

ants' cards to assist in the loading of the Panamolga as employees of Gulf-Tide Stevedores, Inc. Over 100 longshoremen went aboard at about 8:00 A. M. Libelants' gang of 10 men, under a gang pusher, was directed to trim the grain in the No. 2 deep tank in the No. 1 hold. Trimming grain involves leveling off the pile of grain and distributing it evenly into the corner of the deep tank or other cargo space so that it cannot later shift and endanger the ship, and so that the space may be more completely filled. To accomplish this task, it is necessary for the trimmers, with shovels, to go into the hold or deep tank, and standing or kneeling on top of the grain, usually in very close quarters, to pull or shovel it past them from the center to the sides of the compartment. Stevedore's employees removed the No. 1 hatch cover, and libelants and the other members of their gang went down to the lower hold and "scooted" down the pile of grain feet first into the deep tank, moving such grain as was necessary to make openings large enough for them to get in. The pusher remained on the lower hold, which formed the ceiling of the deep tank. Libelants and the other members of their gang entered the deep tank a little after 8:00 A. M. and immediately started trimming and pulling the grain with their shovels to level off the pyramid and distribute the grain equally. I find as a fact that the men worked in the deep tank for approximately 15 minutes before any of them noticed an unusual odor or became sick. Then one man after another noticed an offensive smell, something like rotten eggs, and became nauseated. Their eyes, mouths and skin burned; they were dizzy and numb and their heads ached. After a couple of the men had become sick, the whole crowd tried to leave the deep tank as fast as possible, but found their exit blocked by grain which was pouring into the deep tank through the opening at the top. It took them several minutes to attract the attention of the pusher on the deck above by hammering on the under part of the deck, to have the flow of grain stopped, and then they had to distribute the grain so that they could climb up the ladder and out of the deep tank. All of the men were able to climb out. Several men were violently nauseated and four had to be taken to a hospital for medical attention. The others recovered rapidly upon reaching fresh air. The two men besides libelants who were taken to the hospital were back at work in a few weeks. The men in the other deep tanks and cargo spaces were not affected.

I find as a fact that a substantial amount of grain had been run into that deep tank that morning before the men became sick. The grain loading log of the Panamolga, kept in the office of the Board of Trade inspector, shows that 18,000 bushels of grain were run into holds Nos. 1, 3 and 5 that morning before 8:25 A. M. After 8:25 no grain was run into hold No. 1, but grain was run into other holds until 9:00 A. M., at which time all loading of grain was stopped by the Stevedore foreman because these men had been "gassed".

Grain, such as wheat or milo, is subject to infestation by weevils. The usual method of meeting this condition is to treat the grain with some chemical pest killer, which is usually poured on top of a quantity of grain and sinks through to the bottom, being absorbed by the grain as its seeps through. Much of the grain is brought to the elevator in freight cars and is inspected before it is unloaded from the cars. If contaminated, it is treated in the freight cars before it is put in the elevator. Occasionally it is found that one of the bins in the elevator has become infested and the grain in the bin is similarly treated. After loading on ships, grain is sometimes found to be infested and is fumigated aboard ship.

Various chemicals are used for fumigating grain. In Galveston, one of the fumigants generally used was Weevilcide, which contains carbon disulfide or carbon bisulfide. Some witnesses said carbon disulfide was used, some carbon bisulfide. It was agreed that for the

purposes of this case there is no difference between the two, and in this opinion the chemical used will be called carbon disulfide. The fumigant is sometimes popularly known as "High Life". Carbon disulfide is very explosive and inflammatory; it is customary to mix it with carbon tetrachloride or some other chlorinated hydrocarbon in order to reduce the inflammability and explosiveness. The proportion in Weevilcide is one part of carbon disulfide to three parts of carbon tetrachloride. These chemicals are heavier than air and seep down through and into the grain. Since the operators of grain elevators customarily mix together the contents of a number of different cars and bins before or at the time of loading grain on ships, I find as a fact that it is probable that any large quantity of grain loaded into any cargo space contains a trace at least of fumigants, but I also find that dangerous chemicals are seldom present in sufficient concentration to constitute a danger to the crew, to longshoremen or to other persons working about the ship.

Carbon disulfide may damage the nervous system of men if they work in a concentration of more than 50 to 100 parts per million over a period of 8 hours. The laws of different states fix the danger point at different ratios. Chronic poisoning from exposure over a long period is not uncommon in certain industries. Acute cases are rare, and usually result either in death or in a complete and rapid recovery.

I find as a fact that neither shipowners nor their agents nor masters and crews of vessels nor stevedores and their employees should ordinarily expect grain to contain any dangerous quantity of chemicals unless they have received some warning that the grain has been recently fumigated. There is some conflict in the testimony on this subject, and one or two of libelants' witnesses referred to grain as a dangerous cargo. Other witnesses, who have had considerable experience in the loading of grain on ships, testified that they had never known of

a case where longshoremen or crew members had been affected by chemical fumigants in grain. I find as a fact that the only dangers ordinarily inherent in a cargo of grain are the dangers of combustion or deterioration or swelling of the grain if it is too hot or too wet.

It appears from the testimony of two witnesses that a considerable number of longshoremen had become ill while loading grain on the SS Lipscomb Lykes in Galveston harbor in August, 1949. There is no evidence whether any of these longshoremen were seriously affected, but Dr. Nau, a consulting chemist, testified that one hundred and thirty-five alleged some difficulties, although he also testified that he knew of no doctor in Galveston who had ever treated an acute case of carbon disulfide poisoning. It appears doubtful, therefore, whether the Lipscomb Lykes incident was caused by carbon disulfide. After the Lipscomb Lykes incident, I find as a fact that the City of Galveston, as owner and operator of the Galveston Wharves Elevator, agreed that it would notify shipowners or agents whenever grain about to be loaded had been recently treated with fumigants. I find that no such notice was given by the City in this case. I find as a fact that respondents, their agents and employees, including the master and officers of the Panamolga, did not know, and were not guilty of negligence in failing to learn, that the grain being loaded on the Panamolga had been recently fumigated or that there was any likelihood that longshoremen working in the grain would be likely to encounter carbon disulfide or any other chemical in dangerous concentrations. I find that the agents of the ship in Galveston, the responsible officers of Gulf-Tide Stevedores, Inc., and the libelants and other longshoremen had probably heard of the fact that longshoremen had been made sick by chemical fumigants in grain being loaded on the SS Lipscomb Lykes, but I do not find that either the ship's agents, the officers of the stevedoring company or libelants and their fellow employees had any rea-

son to expect that the grain being loaded on the Panamolga contained carbon disulfide or any other chemical in dangerous concentrations. I further find that if these chemicals were present in dangerous concentration in the grain or any part of it which was run on the evening of October 25 or the morning of October 26, the City of Galveston should have known it and should have notified the ship or its agents and the Stevedore. However, the City is not a party to this suit, and libelants resisted efforts of respondents to remove the case to the district in Texas where the City of Galveston could have been brought into the case.

The grain which was run on the evening of October 25 was sampled and tested in the elevator laboratory in the customary manner. No offensive odors were discovered, and I find that neither carbon disulfide nor carbon tetrachloride was present in dangerous concentrations in the grain which was run into the deep tank during the evening of October 25.

Since I have found that none of the longshoremen who went into the deep tank on the morning of October 26 noticed any odor until about 15 minutes had elapsed, I also find as a fact that if an officer of the ship had gone into the deep tank to inspect the grain on the morning of October 26 before the longshoremen entered the deep tank, he would not, by the exercise of reasonable care, have discovered the presence of any dangerous quantity of carbon disulfide in the grain or in the atmosphere. I find that there was no such dangerous concentration at that time, and I further find as a fact that it is not customary for a ship's officer to inspect the grain in a deep tank during the course of loading where the loading is being done entirely by a stevedore and its employees. I further find as a fact that neither the first officer nor any other representative of the ship nor any inspector or sampler could have discovered, by the exercise of reasonable care, that the grain being loaded from 8:00 A. M. to 8:25 A. M. contained a dangerous quantity of carbon disulfide (if it did contain such dangerous concentration) in time to have stopped the running of the grain before it was in fact stopped.

Respondents contend that libelants were not poisoned by carbon disulfide or any other chemical, but that they were asphyxiated by the normal atmosphere in the deep tank, i. e. normal while grain was being run in. It is true that only four or five out of the ten men in the deep tank developed any symptoms which would indicate an acute poisoning by carbon disulfide or any other chemical, and that none of the men in the other cargo spaces became ill. However, the various medical reports support libelants' own testimony that they had initially a number of symptoms which are compatible with carbon disulfide poisoning. I find that carbon disulfide was present in the atmosphere in the deep tank to a higher degree than usual on the morning of October 26, after the grain had run for some minutes, but not to a degree sufficient to cause serious poisoning to persons not particularly susceptible to its effects.[1] I find that the

---

1. At 10:00 A.M. on October 26, Mr. Vela, a consulting chemist, called by the ship's agents, took samples of the atmosphere above the grain and within the grain in the deep tank, and in the atmosphere above the grain and within the grain in the Nos. 1, 2 and 4 holds. These tests showed the presence of halogenated hydrocarbons such as carbon tetrachloride and of carbon disulfide *in the atmosphere* above the grain in the deep tank in the amount of 19.6 parts per million for one sample and 39.2 parts per million for another. Mr. Vela testified that these con-

centrations are within allowable limits, which vary for different states. Texas allows 50 parts per million and New York 100 parts per million. All such scales have significance only in relation to volume of air breathed and duration of exposure; an eight hour exposure being the norm. The concentration of all such chemicals *within the grain* in the deep tank at that time was found to be 56 parts per million. Vela felt that the deep tank could be safely entered for trimming purposes, although he advised caution. After the men became sick, the

carbon disulfide in the atmosphere, added to the normal concentration of various types of dust and fumes, caused the men in the deep tank to become nauseated, and affected them otherwise in varying degrees. The effect on libelant William McMahan, at least, was aggravated by shock and fear as the result of being trapped in an apparently dangerous place.

Libelants are natives of Oklahoma, where their father owned a house and a small piece of ground. William was twenty-one years of age in October, 1950. He had left school at fifteen after completing the first year of high school. At first he helped his father trucking ice and coal, then worked for a while as a machinist's helper in Galveston, and had been a longshoreman for seven or eight months before October, 1950. He was then unmarried and lived with his brother James and his wife. His average weekly wage was about $50.

Shortly after he came out of the deep tank onto the deck, William was taken to the St. Mary's Infirmary in a private automobile, where a diagnosis was made of "gas poisoning—carbon disulfide". He was discharged the following day, October 27, walking, apparently in improved condition. During the next two months he was treated by Dr. Weinert

and Dr. LeFeber in Galveston, Texas, and was admitted to the John Sealy Hospital in Galveston on December 11, complaining of shortness of breath, vomiting blood and headaches. The diagnosis was "hepatitis due to undetermined cause", and he was discharged on December 22, showing some improvement. "Hepatitis" is a liver condition which could be caused by exposure to carbon disulfide. Several days later his legs gave way under him, and a day or two after that, while lying in bed, he found that he was unable to move his legs and complained of their being numb from the groin down. He was readmitted to St. Mary's Infirmary on December 28, 1950. A diagnosis was made of "psychoneurosis, conversion reaction manifested by paraplegia". On January 12, 1951, he was discharged "apparently in improved condition". He was then able to secure some motion in his right foot. He has regained complete use of his right leg and foot but he still complains of complete inability to use his left leg or to feel any sensation therein below a point midway between the hip and the knee. On January 23, 1951, at the request of the Department of Labor, Bureau of Employees' Compensation, he was admitted to the United States Marine Hospital at Galveston for diagnostic purposes and

grain in the deep tank and other parts of the No. 1 hold was subjected to some artificial ventilation before work was resumed.

Other tests were made later in the day which showed the concentration in the air still within safe limits, although the concentration within the grain was higher. The work was completed without further incident.

The next day samples of grain from the deep tank and from the Nos. 4 and 5 holds were taken to Dr. Nau, a consulting chemist, in tightly closed bottles. Dr. Nau tested for chlorinated hydrocarbons, including carbon tetrachloride, but he did not find them present. He noted the characteristic odor of carbon disulfide when he smelled the grain, but he made no quantitative test for carbon disulfide. He testified he thought that unimportant since it is the quantity in the atmosphere that is important. Dr. Nau testified that

the allowable concentration for carbon disulfide in the atmosphere is 20 parts per million, but that it would take 3,000 parts per million for 30 minutes to produce a case of acute carbon disulfide poisoning. No one made any quantitative test for carbon disulfide alone in the atmosphere, but assuming that all of the toxic material found either in the atmosphere or within the grain by Vela was carbon disulfide, it would not have exceeded 39.2 parts per million in the atmosphere or 56 parts per million within the grain in the deep tank at 10:00 A.M. on October 26, far less than enough to cause acute carbon disulfide poisoning, but, as I have found, enough to smell, and more than is customary. Some carbon disulfide and carbon tetrachloride was found in the air and in the grain in the other holds, but none of the men in any of the other deep tanks or holds became ill.

remained there until February 3. It was noted that there was a stocking distribution of complete absence of light touch, pain and temperature and vibratory sensation in the left leg to the superior part of the thigh. "The patient allegedly cannot move the left leg or tell the position of toes or foot. It is emphasized that there are no abnormal reflexes of the ankle, patella, or any sign of clonus in the left or right leg." The remainder of the physical examination was negative. Laboratory tests were made and the reports of all doctors who had seen him were reviewed by Dr. Lyman, the Medical Director at the Hospital who concluded: "In light of examination done in this hospital and on reports forwarded from previous examinations in other hospitals, it is felt that this man should recover fully from his disability and be able to be gainfully employed."

He was seen by Dr. Ruskin at the Medical Branch of the University of Texas in Galveston. Dr. Ruskin did not testify, his deposition was not taken, and his report was not admitted in evidence. Compensation was continued until sometime in March, 1951, but thereafter the compensation carrier refused to pay any additional compensation or to supply any further medical attention. Libelants were notified of their right to demand a formal hearing in order to secure a continuation of compensation benefits and of their right to elect to sue.

There is some indication that libelants had consulted a lawyer in Houston, Texas, but there is no indication of any action he may have taken. In June, 1951, libelants employed their New York lawyers, who obtained a report of an examination of libelants at the Fite Clinic, Muskogee, Oklahoma, where the general physical examination of William was essentially negative, but a diagnosis was made of hysterical paralysis. It does not appear that any treatment was rendered at the Fite Clinic. Libelants and their counsel did not seek to obtain additional compensation or psychiatric treatment from the compensation insurance carrier, both of which might have been obtained without limit of time, Title 33 U.S.C.A. §§ 907, 908, but elected to sue a third party. This suit in the District of Maryland was filed in October, 1952, more than a year later. Libelants' counsel arranged for them to be examined by Dr. Lawrence I. Kaplan, 55 Park Avenue, New York, on September 1, 1953, and Dr. Kaplan examined libelants a second time shortly before the trial, and testified at the hearing in Baltimore. I find that no effort was made by libelants, their counsel, any of their doctors or the compensation insurance carrier to obtain any psychiatric treatment for them in Oklahoma or elsewhere. There is evidence that competent psychiatric treatment is available at the University of Oklahoma. It is presumably available elsewhere in Oklahoma. I do not find that free treatment could not have been obtained, through relief agencies or otherwise.

Despite his disability, William was married in June, 1951, and lived with his wife's folks for some months. After leaving her home, William and his wife were refused public relief, but later were granted public relief in another county after a child was born to them in April, 1952. In July, 1953, William got a job as a finisher in a pottery factory in Muskogee, Oklahoma. Later, he received a promotion and is now a designer, designing shapes of pottery. His present rate of pay is 75¢ an hour. He walks on crutches with considerable facility. He still complains of pains in his stomach, headaches, pains across his hips, and a tightness around his left thigh above the point where loss of sensation begins.

William was examined on behalf of respondents by Dr. Guttmacher, the psychiatrist for the Supreme Bench of Baltimore City, and by Dr. Cotter, who specializes in internal medicine and neurology. These two doctors and Dr. Kaplan testified at the hearing. It would prolong this opinion unduly to summarize their evidence. I find as a fact that libelant has no physical result of the exposure to carbon disulfide at this time,

but that he has an hysterical paralysis of his left leg. I further find that, as in most such cases, various personality factors enter into the causation of this condition, but that the exposure to an unusual concentration of carbon disulfide, coupled with the shock of the experience in the deep tank, was one of the causative factors in the hysterical paralysis, which developed two months after that incident. I further find as a fact that if the libelant had been furnished psychiatric treatment in 1951 he would probably have recovered after a short period of treatment. I further find as a fact that William is not malingering, although there is some conscious exaggeration of his complaints. I find as a fact that the mere settlement of the litigation will probably not effect a cure, but that if he receives competent psychiatric treatment after the case is disposed of, he will probably recover completely within a period of between one and three months. I find that he has lost wages to date in the amount of $8,030, but that if he had received psychiatric treatment in 1950 the loss of wages would have been materially reduced. I find that libelants needed and would have benefited by psychiatric treatment from 1951 on, and that the sooner that treatment was rendered the better would have been the chance of its being successful. I find that psychiatric treatment will cost $100 a week, but I do not find that he could not have gotten free psychiatric treatment in Oklahoma between 1951 and the present. In any event, the compensation insurance carrier, which will be a principal beneficiary, if not the principal beneficiary, of any net recovery in this case, Title 33 U.S.C.A. § 933, should have made such treatment available in 1951. And if William and his New York counsel had not elected to sue the ship, but had requested the compensation carrier to provide such treatment and the carrier had refused, William could have obtained such treatment himself at the carrier's expense, Title 33 U.S.C.A. § 907. In that event, the right to sue the third party—

the ship or the City—would have been assigned to the compensation carrier, Title 33 U.S.C.A. § 933, which would no doubt have proceeded with such suit through its own counsel.

James presents a very different picture from his brother. He quit school at about fourteen years of age, after completing the fifth grade, and helped his father pick cotton and potatoes. Aside from a period of navy service, I find as a fact that he has been at all times an uneager and irregular worker. He had been working as a longshoreman, for ten months or so before October, 1950. His average weekly wage was about $60. He, too, was taken to St. Mary's Infirmary, his condition diagnosed as "gas poisoning—carbon disulfide", and he was discharged on the following day, apparently in improved condition. He, too, was treated during November and December by Dr. Weinert and Dr. LeFeber and was admitted to the John Sealy Hospital in December, 1950, where the diagnosis was made of "hepatitis due to an undetermined cause". He was also found to have some duodenitis and a spastic colon. He was dismissed from the hospital on December 22, 1950. The hepatitis could have been caused by the exposure to carbon disulfide. James had continued to complain of headaches, pain over the left chest posteriorly and in the left lumbar area, epigastric pain which radiated upward, burning of the stomach and a feeling of weakness. He has repeatedly complained of vomiting blood but, although he was in the John Sealy Hospital for nearly two weeks and in the Marine Hospital for over a week, no one ever saw any evidence of vomiting blood. He was admitted to the Marine Hospital on January 23, 1951, for diagnosis at the instance of the Department of Labor, Bureau of Employees' Compensation. It was noted on the record that he seemed to enjoy hospital life, and the conclusion of Dr. Lyman, the Medical Director of the Marine Hospital, was: "In light of the findings in this hospital and the reports from previous examinations, it is

felt that this man is suffering from a psychoneurosis and that he should be able to return to work."

James received compensation until March, 1951. His New York counsel had him examined by Dr. Kaplan in New York and obtained a report from the Fite Clinic. He was examined for respondents by Dr. Guttmacher and Dr. Cotter. All of them diagnosed his condition as a psychoneurosis. I find as a fact that he is consciously exaggerating his symptoms. On the witness stand whenever he was asked how he felt at any time after October, 1950, he always gave the same collection of complaints. I find as a fact that he has worked very irregularly since October, 1950, but I do not believe his testimony that he has worked as little as he claims. I further find as a fact that since March, 1951, he has not been disabled from working as a result of the exposure to carbon disulfide or anything else resulting from the incident in the deep tank.[2]

### Conclusions of Law

#### *Seaworthiness*

■ A vessel and her owners are liable to indemnify a seaman for an injury caused by the unseaworthiness of the vessel or its appurtenant appliances and equipment. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. In Seas Shipping Co., Inc., v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, it was held that a shipowner's obligation of seaworthiness extends to longshoremen who are injured while aboard and loading the ship and while employed by an independent stevedoring contractor engaged by the owner to load.

■ The obligation is essentially a species of liability without fault. With respect to seamen and longshoremen, it *is an absolute obligation and does not*

depend upon any negligence on the part of the vessel or its owners. Seas Shipping Co. v. Sieracki, supra; The State of Maryland, 4 Cir., 85 F.2d 944. With respect to insurers or shippers of goods, the vessel and its owners may be relieved of liability if they can show that they used due diligence to make the ship seaworthy at the beginning of the voyage and to secure that the ship is properly manned, equipped and supplied. 27 Stat. 445, 46 U.S.C.A. § 192; 49 Stat. 1210, 46 U.S.C.A. § 1304; The Titania, D.C. S.D.N.Y., 19 F. 101; The Floridian, 2 Cir., 83 F.2d 949.

■ The Supreme Court has recently held that an owner's absolute duty to longshoremen to provide a seaworthy vessel, together with its appurtenant appliances and equipment, is not affected by relinquishment of control to another. The owner is liable for defects in equipment brought aboard by a stevedore and used under the stevedore's sole control. Alaska S.S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, affirming Petterson v. Alaska S.S. Co., 9 Cir., 205 F.2d 478; Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L. Ed. 1120; reversing Rogers v. United States Lines, 3 Cir., 205 F.2d 57. However, the shipowner is not liable for injuries resulting solely from the manner in which the work was done by the stevedore and its employees. Berti v. Compagnie De Nav. Cyprien Fabre, 2 Cir., 213 F.2d 397, 400. The ship and its owners are not insurers of the safety of men working on shipboard. Jones v. Gould Steamships & Industrials, Ltd., D.C.Md., 300 F. 109, affirmed 4 Cir., 10 F.2d 792.

■■ The owner's absolute duty or warranty has been extended to the adequacy and competency of the crew. The State of Maryland, 4 Cir., 85 F.2d 944; Berti v. Compagnie De Nav. Cyprien Fabre, 2 Cir., 213 F.2d 397; Keen v.

---

2. I direct that the summary of the more than 700 pages of depositions, prepared by counsel for respondents in accordance with the practice in this court, be included in the record in this case. I have used this summary for the sake of convenience, but have consulted the original depositions where any fact was disputed.

Overseas Tankship Corp., 2 Cir., 194 F. 2d 515, certiorari denied 343 U.S. 966, 72 S.Ct. 1061, 96 L.Ed. 1363. "But it has never been held that it requires the best possible equipment, see Doucette v. Vincent, 1 Cir., 194 F.2d 834, or that the crew will be free from negligence. (Citing cases.) It requires only that equipment be reasonably fit for the use for which it was intended, and that seamen be equal in seamanship to the ordinary men in the calling." Berti v. Compagnie De Nav. Cyprien Fabre, 2 Cir., 213 F.2d 397, at page 400. However, the owner's absolute liability for unseaworthiness is not lessened by the fact that negligence of an officer or member of the crew contributed to the happening of the injury. Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561.

On the same principle that the vessel and her owner are held liable for failure to make her seaworthy or to supply and keep in order proper appliances, they are liable, in this Circuit at least, for failure to instruct a youthful and inexperienced man employed to work around dangerous machinery and to warn him of the dangers to be encountered. "The duty to warn and instruct is so closely akin to that of furnishing suitable appliances as to be in reality a part of the doctrine relating thereto." The State of Maryland, 4 Cir., 85 F.2d 944, at page 947.

The doctrine of seaworthiness has been extended to include improper stowage of cargo, causing personal injuries. Palazzolo v. Pan-Atlantic S.S. Corp., 2 Cir., 211 F.2d 277, 279; The State of Maryland, 4 Cir., 85 F.2d 944, 947, and cases cited. But counsel have cited and I have found no case which extends the warranty of seaworthiness to the condition or ingredients of cargo being loaded onto the ship by stevedore's employees.

In my opinion the warranty of seaworthiness does not go so far as to make the shipowner liable to libelants in this case for any injury which they may have sustained by reason of the presence of an unusual amount of carbon disulfide in the grain being loaded on board the ship. Any claim which libelants may have arising out of this condition must be based upon the alleged negligence of the shipowner or its agents.

This conclusion is supported by a number of cases which have held that the doctrine of seaworthiness does not apply to transitory conditions, even of the ship and its appliances. Cookingham v. United States, 3 Cir., 184 F.2d 213; Daniels v. Pacific Atlantic S. S. Co., D.C.E.D. N.Y., 120 F.Supp. 96, 99; Hanrahan v. Pacific Transport Co., 2 Cir., 262 F. 951, certiorari denied 252 U.S. 579, 40 S.Ct. 345, 64 L.Ed. 726; Adamowski v. Gulf Oil Corp., D.C.E.D.Pa., 93 F.Supp. 115, affirmed 3 Cir., 197 F.2d 523; Holliday v. Pacific Atlantic S. S. Co., D.C., Del., 99 F.Supp. 173; Shannon v. Union Barge Line Corp., 3 Cir., 194 F.2d 584, certiorari denied 344 U.S. 846, 73 S.Ct 62, 97 L.Ed. 658.

Libelants in this case were covered by the Longshoremen's and Harbor Workers' Compensation Act, under which, if permanently disabled, they could get substantial compensation for the rest of their lives, and medical attention without limit. 33 U.S.C.A. §§ 907, 908. This is just the kind of case for which that Act was passed. Moreover, if the injury was caused by negligence on the part of the ship, the owner of the elevator, or anyone else (except libelants' employer), damages for such negligence may be recovered by libelants or by the employer's compensation carrier. 33 U.S.C.A. § 933. In either event, the compensation carrier would be reimbursed for what it may have spent and would be relieved from future liability for compensation and medical attention, at least to the extent of the recovery from the negligent third person. There is no valid reason to shift the burden of such a case as this from the compensation insurance carrier to the shipowner, unless the ship's officers, agents or employees were negligent. The compensation insurance carrier has received a premium for carrying the risk, and is

quite as able to "distribute the risk" as the ship.

### Negligence

In addition to the duty to provide a seaworthy ship on which libelants might work, respondents owed libelants, as business visitors or invitees, the duty to use reasonable care to provide a reasonably safe place to do their work. Fodera v. Booth American Shipping Corp., 2 Cir., 159 F.2d 795; Tysko v. Royal Mail Steam Packet Co., 9 Cir., 81 F.2d 960; Brabazon v. Belships Co., Ltd., 3 Cir., 202 F.2d 904; Anderson v. Lorentzen, 2 Cir., 160 F.2d 173; Palazzolo v. Pan-Atlantic S.S. Corp., 2 Cir., 211 F.2d 277; Smith v. Hercules Co., 204 Md. 379, 386, 104 A.2d 590, 594. See also Brislin v. United States, 4 Cir., 165 F.2d 296. This duty was non-delegable and persisted despite any concurrent duty on the part of the stevedoring company. Palazzolo v. Pan-Atlantic S.S. Corp., supra; Anderson v. Lorentzen, supra.

If there were conditions which made the place to work unsafe and if respondents, their officers, agents and employees knew of such conditions, or by the exercise of reasonable care should have learned of such conditions, respondents were under a duty to warn libelants of such conditions. Anderson v. Lorentzen, supra; Puleo v. H. E. Moss & Co., D.C.E.D.N.Y., 66 F.Supp. 78, affirmed in part, 2 Cir., 159 F.2d 842, certiorari denied 331 U.S. 847, 67 S.Ct. 1736, 91 L.Ed. 1857; McFall v. Compagnie Maritime Belge, 304 N.Y. 314, 107 N.E.2d 463, 1952 A.M.C. 1860. There is no evidence in this case that respondent's officers, agents or employees knew that there was, or was likely to be, any dangerous concentration of carbon disulfide or of any other chemical in the grain which was being loaded. The question, therefore, arises whether respondent's officers, agents and employees exercised reasonable care under the circumstances to discover whether or not such dangerous concentrations were present.

Respondents were charged with whatever knowledge they would have acquired as to the nature and characteristics of the cargo to be carried on their ship, by the exercise of reasonable care to acquaint themselves with the facts, and were bound to take reasonable precautions in the light of such knowledge to protect the cargo and the men working on it. Bank Line v. Porter, 4 Cir., 25 F.2d 843; Anderson v. Lorentzen, 2 Cir., 160 F.2d 173; The Willfaro, D.C.N.D.Cal.S.D., 9 F.2d 940, affirmed Williams S.S. Co. v. Wilbur, 9 Cir., 9 F.2d 622, certiorari denied 271 U.S. 666, 46 S.Ct. 482, 70 L.Ed. 1140. But in determining what degree of care was reasonable, the court must consider established custom and usage, and particularly the custom and usage of the port. A/S J. Ludwig Mowinckels Rederi v. Accinanto, Ltd. (The Ocean Liberty), 4 Cir., 199 F.2d 134; The Rangoon Maru, 2 Cir., 27 F.2d 722; The Floridian, 2 Cir., 83 F.2d 949; The Cabo Hatteras, D.C.S.D.N.Y., 5 F.Supp. 725. I have found as a fact that there was no dangerous concentration of carbon disulfide in the grain or in the atmosphere in the deep tank at 8.00 A.M. on October 26. I have further found as a fact that neither the first officer nor any other representative of the ship nor any inspector or sampler could have discovered, by the exercise of reasonable care, that the grain being loaded from 8.00 A.M. to 8.25 A.M. contained a dangerous quantity of carbon disulfide (if it did contain such dangerous concentration) in time to have stopped the running of grain before it was stopped in fact. I have further found as a fact that the respondents, their agents and employees, including the master and officers of the Panamolga, did not know and would not, by the exercise of reasonable care, have learned that the grain being loaded on the Panamolga had been recently fumigated or that there was any likelihood that longshoremen working in the grain would be likely to encounter carbon disulfide or any other chemical in dangerous concentrations.

 I find that the injury to the libelants was not caused by any negligence on the part of respondents. The accepted authorities on seamanship make no reference to the possibility of a dangerous concentration of fumigants in grain being loaded. U. S. Dept. of Commerce, Modern Ship Stowage, 1942, pp. 247–266; Thomas, Stowage, 1928, pp. 147–155; Turpin & MacEwen, Merchant Marine Officers' Handbook, 1950, pp. 8–20, pp. 15–26. After the Lipscomb Lykes incident in 1949, the City of Galveston agreed to notify ships' agents when grain that had been recently fumigated was about to be loaded from its elevators, but no such notice was given to the agents of the Panamolga in this case. Whatever negligence there was in this case was on the part of the City and not on the part of the ship.

 It appears from the evidence that seamen have loaded grain on ships all over the world for many years, and I have found as a fact that shipowners and their officers and agents have no reason to expect that grain will contain dangerous concentrations of chemicals unless they are especially warned by the shipper or the elevator owner that the grain has been recently fumigated. "One who seeks redress at law does not make out a cause of action by showing without more that there has been damage to his person. If the harm was not willful, he must show that the act as to him had possibilities of danger so many and apparent as to entitle him to be protected against the doing of it though the harm was unintended." Palsgraf v. Long Island R. Co., 248 N.Y. 339, 345, 162 N.E. 99, 101, 59 A.L.R. 1253. This passage was quoted with approval by the Court of Appeals of New York in the recent case of McFall v. Compagnie Maritime Belge, 304 N.Y. 314, at page 325, 107 N.E.2d 463, 1952 A.M.C. 1860, at page 1867, which was one of the authorities principally relied upon by libelants in this case. In the McFall case, the Court of Appeals of New York held that there had been no showing that the mere act of stowing carbon tetrachloride in the deep tanks had possibilities of danger "so many and apparent" that the plaintiff was entitled "to be protected against the doing of it". 304 N.Y. at page 326, 107 N.E.2d at page 469, 1952 A.M.C. at page 1867. Certainly, the mere act of stowing grain in deep tanks does not have possibilities of danger so many and so apparent that libelants are entitled to be protected against the doing of it, in the absence of a showing that respondents knew or should have known that the grain contained a dangerous concentration of fumigants.

### Conclusion

It follows that judgment should be entered for respondents, dismissing the libel. This makes it unnecessary to pass upon the amount to which libelants would have been entitled if the decision had been in their favor.

Let judgment be entered for respondents dismissing the libel, with costs.