James J. WALDRON, Plaintiff-Appellant,

v.

MOORE–McCORMACK LINES, INC.,
Defendant-Appellee.

No. 93, Docket 29504.

United States Court of Appeals
Second Circuit.

Argued Oct. 27, 1965.

Decided Jan. 31, 1966.

J. Joseph Smith, Circuit Judge, dissented.

Theodore H. Friedman, New York City, (Henry Isaacson and Phillips, Nizer, Benjamin, Krim & Ballon, New York City, on the brief), for plaintiff-appellant.

William M. Kimball, New York City (Burlingham, Underwood, Barron, Wright & White, New York City, on the brief), for defendant-appellee.

Before LUMBARD, Chief Judge, and MEDINA and SMITH, Circuit Judges.

MEDINA, Circuit Judge:

James J. Waldron, an able seaman and a member of the crew of the SS Mormacwind, fell and injured his back as he and another member of the crew were hauling a heavy manila mooring line along the deck of the vessel during a docking operation. The issue of negligence and several features of the issue of unseaworthiness, as claimed by Waldron, were submitted to the jury who returned a verdict for defendant. One of the unseaworthiness claims against the shipowner having been dismissed and the motion for a new trial denied, the seaman appeals. The sole question before us on this appeal is whether the trial judge committed error when he refused to permit the jury to pass upon Waldron's additional claim of unseaworthiness based upon an order of the third mate that 2 men were to carry the line from where it was coiled on a grating on the deck to a mooring chock approximately 56 feet away. There was expert evidence to the effect that 3 or 4 men rather than 2 were required to carry the line in order to constitute "safe and prudent seamanship." It is not disputed that the vessel was properly and fully manned and that the crew, including the officer who gave the order, were in all respects competent to perform their duties.

The findings implicit in the verdict are: (1) that the order given by the third mate was not a negligent order, that is to say, plaintiff failed to convince the jury that under the circumstances a reasonably prudent man would not have given such an order; and (2) that the vessel was not unseaworthy because the deck was tacky from wet paint or was wet and slippery. No shore workers are involved nor is there any claim of a defect in the vessel or any of its gear, equipment and appliances.

I.

According to the log, the docking operation of SS Mormacwind at her Brooklyn pier was consummated in 11 minutes, between 1:20 and 1:31 P.M. on May 8, 1960. Coast Guard regulations required the vessel to carry on deck, in the unlicensed category, 6 able seamen and 3 ordinary seamen. In fact, she carried a boatswain and two deck utility men in addition. Thus the SS Mormacwind had three more unlicensed deck crewmen than her certificate required and all of them were on board during the docking operation.

Waldron was working in the aft docking gang on the starboard side of the ship, inboard, under the command of Tarantino, the third mate. The usual complement of this gang was 3 able seamen and 2 ordinary seamen. On this particular occasion, Tarantino had under his orders 4 able seamen, including Waldron, and 1 ordinary seaman.

As the operation progressed with the requisite dispatch, the officer on the bridge decided another mooring line was necessary as a spring line and the order was passed on to Tarantino. As all the other men were occupied with urgent tasks connected with the other lines, Tarantino assigned to Waldron and another able seaman, who was exceptionally strong and capable, the task of putting out this new line "as quickly as possible." The other seaman took the eye of the line,

threw about 15 feet of slack "over one shoulder and over the other," and had reached the chock. Waldron was tugging at the top of the coil, attempting to flake some slack along the deck, when he slipped and fell.

Waldron's position on the particular phase of the claim of unseaworthiness that Judge Tenney refused to submit to the jury was very clear to the effect that "[i]t is a question of how many men were assigned to this particular job." It made no difference how well the vessel was manned. Nor was it of consequence that an adequate number of competent seamen were assigned to the group handling the lines aft under the direction of the third mate. "There could have been a hundred men on the stern, or five." Similarly, he contended that other factors, such as the urgency of getting out the new line, the tasks being performed by the other men, the condition of the current, wind and so on, were absolutely irrelevant to the issue of unseaworthiness, even though they did have a bearing on the issue of negligence.

We agree with Judge Tenney, whose short memorandum opinion is not reported, and we affirm.

## II.

█ The doctrine of unseaworthiness has had a long history. The so-called warranty of seaworthiness in early American law has its roots in contracts of marine insurance and affreightment, under which liability was conditioned on the vessel being "sufficient in all respects for the voyage; well-manned, and furnished with sails and all necessary furniture." 1 Conkling, Admiralty Jurisdiction, 164–5 (1848). A similar requirement, stemming from the ancient codes, was implied in contracts for the carriage of goods and passengers by sea. Abbott, Merchant Ships and Seamen, 178–9 (1802); see The Caledonia, 1895, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644. This duty to provide a seaworthy vessel was absolute, see Work v. Leathers, 1878, 97 U.S. 379–380, 24 L.Ed. 1012; Abbott, Merchant Ships and Seamen, supra, at 178, 181; and,

even in its early foundations, seaworthiness was a threefold concept: the vessel must be "tight and staunch," her gear, equipment and appliances must be serviceable and in good order, and the crew, including the master and his subordinates, must be competent and sufficient in number to man the ship. 1 Parsons, Maritime Law 122 (1859); Desty, Manual of the Law Relating to Shipping and Admiralty, Section 232 (1879); Lord v. Goodall S.S. Co., C.C.D.Cal., 1877, 15 Fed.Cas. pp. 884, 887–888 (No. 8,506), aff'd on other grounds, 1880, 102 U.S. 541, 26 L.Ed. 224; In re Meyer, N.D. Cal., 1896, 74 F. 881, 885; The Gentleman, S.D.N.Y., 1845, 10 Fed. Cas. pp. 190, 192 (No. 5,324), rev'd on other grounds, C.C.S.D.N.Y., 10 Fed. Cas. p. 188 (No. 5,323); Tait v. Levi, [K.B. 1811] 14 East 481.

█ For a variety of reasons, historical, ethical, sociological and others, we should not be surprised to find that the interests of cargo owners and passengers were paramount in the early days just referred to. Humanitarian considerations were not in vogue. Although the unseaworthiness of a vessel gave a seaman the right to abandon ship without penalty and to be paid his wages, see Dixon v. The Cyrus, D.Pa., 1789, 7 Fed. Cas. p. 755 (No. 3,930); Rice v. The Polly and Kitty, D.Pa., 1789, 20 Fed. Cas. p. 666 (No. 11,754), and mariners were entitled to maintenance and cure for injuries suffered in the service of the ship, see Harden v. Gordon, C.C.D.Me., 1823, 11 Fed.Cas. p. 480 (No. 6,047), the early maritime law afforded no remedy by way of compensatory damages for personal injuries. See Lucas, Flood Tide: Some Irrelevant History of the Admiralty, 1964 Supreme Court Review 249, 299; Smith, Liability in the Admiralty for Injuries to Seamen, 19 Harv.L.Rev. 418, 431 (1906).

From 1903 and the much discussed dictum of The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, through the Jones Act in 1920, 41 Stat. 1007, 46 U.S.C., Section 688, the long series of longshoreman cases, down to Mitchell v.

Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, and beyond, there has developed a vast body of federal law concerning the right of a seaman, or a person performing the traditional duties of a seaman, to recover compensatory damages for injuries caused by the unseaworthiness of the vessel. It no longer matters in these personal injury cases whether the unseaworthy condition was caused by the negligence of the shipowner or anyone else. The rule that the so-called warranty applies only to the vessel as she left her home port at the commencement of the voyage, which posed the problem we found so vexing in Dixon v. United States, 2 Cir., 1955, 219 F.2d 10, has, at least in some respects, been blown away by the winds of time. But the basic threefold concept of a sound ship, proper gear and a competent crew has remained unchanged. Each of these contributes in a special way to provide "a vessel reasonably suitable for her intended service." Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 550, 80 S.Ct. 926, 933, supra. It may therefore be profitable briefly to examine the developments in the maritime law applicable to each of these three separate but complementary phases of the warranty of seaworthiness.

■■ Little need be said concerning the requirement of a ship "tight and staunch," as the 1936 Carriage of Goods by Sea Act, 46 U.S.C., Sections 1300 ff., has cut down the shipowner's duty to the exercise of due care only with respect to cargo owners. We have found nothing to indicate that the duty to furnish a sound ship is less than absolute vis-à-vis members of the crew. Pertinent illustrations are cracked plates, McGhee v. United States, 2 Cir., 1947, 165 F.2d 287, the falling of a rotted signal mast, Nagle v. United States, S.D.N.Y., 1953 A.M.C. 2109, blobs of grease or spots of oil on the deck or on ladders, Yanow v. Weyerhaeuser S.S. Co., 9 Cir., 1957, 250 F.2d 74, cert. denied, 1958, 356 U.S. 937, 78 S.Ct. 779, 2 L.Ed.2d 812; Calderola v. Cunard S.S. Co., 2 Cir., 1960, 279 F.2d 475, cert. denied, 364 U.S. 884, 81 S.Ct. 172, 5 L.Ed.2d 104. Often, and probably generally, the question is one of fact for the judge or jury as in Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, supra, where there was fish gurry on the ship's rail. See also Blier v. United States Lines Co., 2 Cir., 1961, 286 F.2d 920, cert. denied, 368 U.S. 836, 82 S.Ct. 32, 7 L.Ed.2d 37. But there must always be proof on the basis of which a finding of unseaworthiness can be made.

It is with respect to the ship's gear, equipment and appliances that the most significant developments along liberal lines have taken place. It now makes no difference that other safe gear was available but not used. See, e. g., Mahnich v. Southern S.S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. Shore workers, including longshoremen and others performing tasks traditionally the work of seamen, became entitled to the benefits of the warranty of seaworthiness. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. And the doctrine has been applied to them even if the defective gear was supplied by the stevedore who brought it aboard ship. See, e. g., Alaska S.S. Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, affirming 205 F.2d 478 (9 Cir., 1953). Even if the gear or appliances were not defective, a maladjustment might make them dangerous and the vessel could be found unseaworthy. Crumady v. The Joachim Hendrick Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed. 2d 413. So also with a stuck valve that could only be "broken" by the use of tools or several men working together. American President Lines, Ltd. v. Redfern, 9 Cir., 1965, 345 F.2d 629. So also with a portable aluminum ladder leading to the hold which slipped out of place and fell due to the movement of the ship, despite the fact that an officer had placed a man to hold it and had told him to keep watch over it. Reid v. Quebec Paper Sales & Transp. Co., 2 Cir., 1965, 340 F.2d 34. Other instances of dangerous conditions caused by defects in, or anal-

ogous improper use of, various types of gear and equipment could be multiplied.[1]

Many of the cases above referred to, and others, have been cited in appellant's brief. We are urged to take the position in this case that the principles of these gear and equipment cases are applicable here on the theory that any condition aboard ship that is of potential danger to the members of the crew is necessarily a condition of unseaworthiness, irrespective of how it came into existence and, of course, irrespective of any negligence or fault on the part of the shipowner or his agents or the officers or other members of the crew.

■■ The reason we cannot do this is inherent in the traditional triple concept of unseaworthiness. With respect to the crew, including the officers, all that is or has been required is that the vessel be properly manned. That is to say, in order to be "reasonably suitable for her intended service" the vessel must be manned by an adequate and proper number of men who know their business. There is no requirement that no one shall ever make a mistake. If someone is injured solely by reason of an act or omission on the part of any member of a crew found to be possessed of the competence of men of his calling, there can be no recovery unless the act or omission is proved to be negligent. We have found no authority to the contrary. Indeed, this rule seems to us to be based not only on a uniform course of judicial opinion but also on sound reason. In the management of the vessel both at sea and in port, moments of lesser or greater urgency are bound to occur when quick decisions have to be made, and there is always the possibility of what may appear by way of hindsight to be errors of judgment. To alter the rule, in the absence of legislation, would, we think, come close to requiring the shipowner to provide "an accident proof" ship, which the teaching of Mr. Justice Stewart's landmark and highly clarifying opinion in Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 550, 80 S.Ct. 926, supra, specifically negates.

### III.

■■ In any event, the uniform current of authority in this Circuit supports the view and we hold that, if the shipowner has furnished a well-manned ship, with a competent crew, there can be no liability for personal injuries caused by an order of an officer of the ship that is not proved to be such as would not have been made by a reasonably prudent man under the circumstances.

In The Magdapur, S.D.N.Y., 1933, 3 F. Supp. 971, Judge Patterson decided the precise question here involved and held that the vessel was not shown to be unseaworthy. The only difference is that 3 men were ordered to move a heavy mooring wire and there was evidence that 6 or 7 men were necessary. The ground of decision was that the warranty of seaworthiness required only an adequate number of competent men in the crew and it was not shown that any of the men on hand and available lacked the skill and ability of men of their calling. "The error was that of the chief officer in assigning to the particular task too few of the men available for work." 3 F.Supp. at 972.

Judge Patterson's ruling in The Magdapur was cited with approval by Judge Learned Hand in 1952 in Keen v. Over-

---

1. Grillea v. United States, 2 Cir., 1956, 232 F.2d 919, 922, refers to the question "whether a *defect in hull or gear* that arises as a momentary step or phase in the progress of work on board should be considered as an incident in a continuous course of operation" (emphasis supplied). See also Ferrante v. Swedish American Lines, 3 Cir., 1964, 331 F.2d 571, petition for cert. dismissed, 379 U.S. 801, 85 S.Ct. 10, 13 L.Ed.2d 20; Thompson v. Calmar S.S. Corp., 3 Cir., 1964, 331 F.2d 657, cert. denied, 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184.

In DeLima v. Trinidad Corporation, 2 Cir., 1962, 302 F.2d 585, there was not only a quantity of oil on the deck of the engine room but the vessel was not properly manned, as 2 of the 3 wipers had left the ship earlier in the voyage and had not been replaced.

seas Tankship Corp., 2 Cir., 194 F.2d 515, cert. denied, 343 U.S. 966, 72 S.Ct. 1061, 96 L.Ed. 1363, in the course of his discussion of the point that, if a member of the crew was incompetent, it was not necessary to prove that the shipowner knew or had reason to believe he was incompetent.

Two later cases in this Circuit also follow the principle that there must be proof of incompetence on the part of an officer of the vessel to warrant a finding of unseaworthiness based upon "allegedly imprudent action by a seaman's superior." Ezekiel v. Volusia S.S. Co., 2 Cir., 1961, 297 F.2d 215, 217, 91 A.L.R.2d 1013, cert. denied, 1962, 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847; Pinto v. States Marine Corp., 2 Cir., 1961, 296 F.2d 1, cert. denied, 1962, 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847. We adhere to these rulings.

Affirmed.

J. JOSEPH SMITH, Circuit Judge (dissenting):

I dissent.

The central proposition of the Court's opinion is the rule stated in Pinto v. States Marine Corp. of Delaware, 296 F.2d 1 (2 Cir. 1961), cert. den. 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847 and in Ezekiel v. Volusia S.S. Co., 297 F.2d 215 (2 Cir. 1961), cert. den. 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847, that the doctrine of unseaworthiness does not extend to an injury caused by "an order improvidently given by a concededly competent officer on a ship admitted to be in all respects seaworthy," Gilmore & Black, The Law of Admiralty (1957), 320. Gilmore and Black call such a case "an almost theoretical construct." For two reasons I do not believe this proposition even if it still has vitality should control this case.

First, the proposition evidently refers to cases where there is alleged to be a negligent creation of unseaworthiness. Gilmore & Black cited Chelentis v. Luckenbach S.S. Co., 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171 (1918), McMahan v. The Panamolga, 127 F.Supp. 659 (D.Md.

1955), and Imperial Oil, Ltd. v. Drlik, 234 F.2d 4 (6 Cir. 1956), all dealing either with negligence or the negligent creation of unseaworthiness. In this case, however, appellant's claim for unseaworthiness which was dismissed did not depend on negligence; it survives the verdict making it implicit that there was no negligent order given.

Second, appellant does not admit that the ship was "in all respects seaworthy." His case is that the ship was unseaworthy because of the manner in which the rope was used. Whether an appliance or item of gear is serviceable and in good order cannot be determined abstractly. It depends on whether the gear is reasonably fit for its intended use. Inquiry into this involves determining both the purpose for which the gear is used, and the manner in which it is used. This is precisely what occurred in American President Lines, Ltd. v. Redfern, 345 F.2d 629 (9 Cir. 1965), Ferrante v. Swedish American Lines, 331 F.2d 571 (3 Cir. 1964), and Crumady v. The Joachim Hendrick Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). In each of these cases there was unseaworthiness because gear was employed in a manner which turned out to be improper. In *Ferrante* it was "undisputed that the ship's equipment—the manila ropes—was fit for its intended use." Yet it was used in an abnormal manner, and injury resulted. And in *Redfern*, the court said, "[a] stuck sea valve * * * is suitable only if operated by two men; otherwise it constitutes a dangerous condition," and held that the vessel was unseaworthy. In *Crumady*, unseaworthiness resulted when a circuit breaker safety device in a winch was set for a stress greater than the same working load on the unloading gear.

I see no meaningful difference between rendering safe equipment defective and unsafe, which is *Crumady*, see also International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830 (1901), and using equipment in a manner which makes it unsafe, which is *Ferrante, Redfern*, and this case.

The fact that the unsafe method arose out of an order does not excuse the ship. An order usually lurks in the background of the act of a seaman in the performance of his duties.

Nor is the fact that the crew was as a whole complete a bar to recovery. In the first place appellant alleges that it was the method of employing gear which made the vessel unseaworthy, not crew size or competence. Secondly, the argument that the crew as a whole was adequate is merely stating in another form the defense rejected in Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), that the vessel had available safe equipment which was not used. The unseaworthiness issue in The Magdapur, 3 F.Supp. 971 (S.D.N.Y.1933), was decided solely on the theory that the vessel as a whole was adequately manned. This rationale cannot stand in the face of the development of the doctrine in the intervening years, illustrated by the holding in *Mahnich*.

I would reverse for new trial on the unseaworthiness issue.