**Carmelo CANDIANO, Plaintiff,**

v.

**MOORE–McCORMACK LINES, INC., Defendant and Third-Party Plaintiff,**

v.

**JOHN W. McGRATH CORPORATION, Third-Party Defendant.**

United States District Court
S. D. New York.
March 15, 1966.

---

Max D. Krongold, New York City, for plaintiff; Ezekiel Jasper, New York City, of counsel.

Burlingham, Underwood, Barron, Wright & White, New York City, for defendant and third-party plaintiff; James W. Lynch and Owen B. Walsh, New York City, of counsel.

Joseph F. McGoldrick, New York City, for third-party defendant; Martin J. Mc-Hugh, New York City, of counsel.

FEINBERG, District Judge.

This is an admiralty action for personal injuries by plaintiff Carmelo Candiano against Moore-McCormack Lines, Inc. ("Shipowner"), owner of the ship on which Candiano was working when injured. Shipowner impleaded John W. McGrath Corporation ("Stevedore"), employer of Candiano and stevedore for Shipowner.[1]

Plaintiff was hit by a falling hatch beam weighing about a ton while working in the lower hold of the "S. S. Mormachawk" shortly after midnight, on the morning of February 18, 1961. The ship was at its berth at the 23rd Street Pier in Brooklyn. Shipowner denies liability and contests the alleged damage; Stevedore, while also arguing against plaintiff's recovery, does not strenuously contest its obligation to indemnify Shipowner if the latter is liable to plaintiff. Plaintiff's viable theory of recovery at this stage is unseaworthiness; a negligence count was dismissed during trial without objection.

Plaintiff, as part of a gang of carpenters, was chocking cargo in the lower hold of No. 3 hatch on the night in question. The accident occurred while longshoremen, also employed by Stevedore, were engaged in placing a steel hatch beam on No. 3 tween deck hatch preparatory to covering up the hatch prior to sailing. While the steel hatch beam was being placed athwart tween deck hatch No. 3 and was suspended over the square of the hatch, a hook inserted into the opening at one of the ends of the hatch beam became dislodged and the beam fell into the lower hold. The heavy beam struck plaintiff and knocked him down. Plaintiff was rendered unconscious by the blow and injured severely, as discussed more fully below, and was taken out of the hold and off the ship by stretcher and transferred to a hospital.

I

The basis of plaintiff's claim is that the ship was unseaworthy because the device used to lower the hatch beam was not reasonably fit for its intended use. All parties agree that the longshoremen used a pontoon bridle to secure the beam to the cargo falls (or hoist rope). The bridle consisted of four equal lengths of wire; each had at one end a pontoon hook and was attached at the other end to a common ring. One hook was inserted into a hole at one end of the twenty-foot long hatch beam and another hook was attached at the other end; the remaining two hooks were looped up and placed into the common ring. Plaintiff claims that a different type of bridle—a toggle beam bridle—was the proper appliance for lowering a steel hatch beam. The distinguishing feature of a toggle bridle is that at one end a metal bar rather than a hook is attached to a length of chain; by passing the chain and metal bar through the hole of a hatch beam and then positioning the bar properly, the hatch beam is prevented from falling off the bridle. Plaintiff argues that if a toggle beam bridle had been used instead of a pontoon bridle, the hatch beam could not have been dislodged and it would not have fallen. Accordingly, plaintiff argues that an improper and unsafe appliance was used, thereby rendering the ship unseaworthy. Shipowner claims that the pontoon bridle was reasonably fit for its intended purpose and, in any event, toggle bridles were supplied by the ship and made available to Stevedore.

There is little doubt that the lowering mechanism utilizing the pontoon bridle, as it was actually used by the longshoremen, was unsafe and therefore unfit. The evidence shows that the hook that became dislodged had not been fully brought through the hole in the hatch beam and made secure to the standing part of the bridle. Shipowner's claim that the pon-

toon bridle was reasonably fit is based upon the proposition that had this operation been performed, the hatch beam would have been secure. Shipowner thus argues that the longshoremen's failure to properly secure the beam was "operational negligence," so that no unseaworthiness had as yet resulted. The cases in this circuit do make a distinction between operational negligence and an unseaworthy condition negligently created,[2] denying the ship's liability in the former case. The difficulty lies in defining when negligent conduct ends and an unseaworthy condition begins. In Grillea v. United States, 232 F.2d 919, 922 (2d Cir. 1956), Judge Learned Hand stated:

> It would be futile to try to draw any line between situations in which the defect is only an incident in a continuous operation, and those in which some intermediate step is to be taken as making the ship unseaworthy. Nevertheless, it is necessary to separate the two situations, even though each case must turn on its particular circumstances.

In Puddu v. Royal Netherlands S. S. Co., 303 F.2d 752, 756 (2d Cir.) (per curiam in banc), cert. denied, 371 U.S. 840, 83 S.Ct. 67, 9 L.Ed.2d 75 (1962), Judge Hays, in a concurring opinion stated (303 F.2d at 757):

> The difficulty with the concept of unseaworthiness arises from the fact that while the authorities hold that there is liability without fault, there is no case which holds that there is absolute liability. The situation demands, then, that without regard to fault, we fix a point short of absolute liability. But logical coordinates for fixing a point, such as the time during which a particular condition continues to exist, are entirely lacking. Time is obviously irrelevant since notice to the shipowner is of consequence only if his liability is limited by fault. See Mitchell v. Trawler Racer, Inc., 362

U.S. 539, 80 S.Ct. 926, 4 L.Ed. [2d] 941 (1960).

Perhaps the best that can be done is, like Judge Hand in Grillea v. United States, 232 F.2d 919 (2d Cir. 1956), to take as the starting point a condition of reasonable fitness for intended use, to consider this condition as impaired by the conduct or process which is the subject of litigation, and to call the resulting condition "unseaworthiness." The conduct or process by which the fitness is changed to unfitness is not then to be classified as itself constituting unseaworthiness.

A ship is not unseaworthy because it has glass in a window which might be broken. The injuries of a seaman who negligently breaks such a glass are not the result of unseaworthiness, nor are the injuries of a seaman who is cut by the falling glass. But injury incurred in stepping on the broken glass does result from unseaworthiness.

The rule is far from satisfactory, but it has the virtue of being possible, though not easy, of application, and of having behind it the authority of a great judge. The situation itself does not permit the formulation of a really satisfying rule.

This distinction was recently re-affirmed in Norfleet v. Isthmian Lines, Inc., 355 F.2d 359 (2d Cir. 1966).

In *Grillea,* the wrong hatch cover was placed over a pad-eye "only a short time" before libelant, a longshoreman, stepped on it and it gave way beneath him. This was held (2–1) to constitute a condition of unseaworthiness. In *Puddu,* a boom buckled while a rain tent was being raised and the falls of a winch were being stretched to a dangerously large angle. It was there held (7–2) that no condition of unseaworthiness had as yet been created.

The distinction has been questioned in this circuit[3] and is not accepted

2. See Note, The Doctrine of Unseaworthiness in the Lower Federal Courts, 76 Harv.L.Rev. 819, 827–828 (1963).

3. See Reid v. Quebec Paper Sales & Transp. Co., 340 F.2d 34, 37 (2d Cir. 1965).

in some other jurisdictions.[4] However, accepting it as the applicable law in this circuit, I find that an unseaworthy condition had already come into being at the time the hatch beam fell and this condition caused the injury to plaintiff. There was an appreciable period of time after the hatch beam was secured to the cargo falls and before the beam fell off as it was being lowered. Once the beam was attached to the pontoon bridle—albeit insecurely, as later became clear—the lowering mechanism was clearly unsafe and, therefore, unseaworthy. The negligence of the stevedores in failing properly to secure the hook holding the beam had already been completed. Therefore, under the *Grillea-Puddu* distinction, the ship was unseaworthy at that time. Concededly, determination of the dividing line between operational negligence and an unseaworthy condition is difficult but crucial, and much depends on what is considered to be the negligent act that has or has not come to an end.[5] However, my finding is supported by Strika v. Netherlands Ministry of Traffic, 185 F.2d 555 (2d Cir. 1950), cert. denied, 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343 (1951), where the manner of hooking up two bridles to lift a heavy piece of metal was unsafe and rendered the ship's gear unseaworthy. See also Skibinski v. Waterman S. S. Corp., 242 F.Supp. 290 (S.D.N.Y.1965), relying on *Strika,* where plaintiff was injured because an open-mouth cargo hook, without any locking device, was used to lower a ladder which fell upon plaintiff. But cf. Massa v. C. A. Venezuelan Navigacion, 332 F.2d 779 (2d Cir.), cert. denied, 379

U.S. 914, 85 S.Ct. 262, 13 L.Ed.2d 186 (1964).[6]

■■ Shipowner also contends that the ship cannot be held unseaworthy because proper equipment—a toggle bridle —was on board and available. However, this contention was squarely met and rejected in *Strika,* supra, where Judge Learned Hand stated (185 F.2d at 556):

[B]ut other "bridles" were available which could have been used, and which had a single ring with four lengths of wire. These concededly would have been suitable, and the defendant asserts that their presence made the ship seaworthy, even if they were not used. In answer we need only cite Mahnich v. Southern S. S. Co. [321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944).]

In *Mahnich,* cited by the court, a seaman was injured when a staging collapsed because a piece of defective rope parted. Sound rope was available on board, which could have been but was not used. The Court held that the ship was unseaworthy and that any negligence of the ship's officers in selecting and using defective, rather than proper, rope did not relieve the ship of the duty of furnishing "a seaworthy staging." Clearly, this reasoning applies to many cases where an unseaworthy condition has been negligently created, but proper equipment is on board. Thus, if a seaman should negligently remove a hatch cover leaving a dangerous hole, that portion of the deck would thereafter be unseaworthy unless the hole was covered up. The proper equipment to cover the hole would be available, yet it would not seem that this would insulate the ship against a claim

4. Ferrante v. Swedish Am. Lines, 331 F. 2d 571 (3d Cir.), cert. dismissed, 379 U. S. 801, 85 S.Ct. 10, 13 L.Ed.2d 20 (1964); Scott v. Isbrandtsen Co., 327 F.2d 113 (4th Cir. 1964). Contra, Billeci v. United States, 298 F.2d 703 (9th Cir. 1962).

5. See Reid v. Quebec Paper Sales & Transp. Co., supra note 3, 340 F.2d at 38 n. 5.

6. Although Shipowner and Stevedore cite *Massa* as an example of operational negligence, it is more likely that the case simply held that the appliance in question could

be deemed reasonably fit. The court said (332 F.2d at 781):

Nor can we say that the plaintiff and his co-worker had rendered the ship unseaworthy by placing the tongs in the wrong holes. The doctrine of unseaworthiness requires no more than that a ship and appurtenances be reasonably fit for their intended use, and *the trial court was justified in concluding that the pallets were reasonably fit.* (Emphasis added.)

of unseaworthiness. This reasoning is implicit in *Grillea,* supra, where a wrong hatch cover was used to cover a pad-eye. Although a proper hatch cover was available, the ship was nevertheless unseaworthy. Since a longshoreman doing seamen's work on board a ship is extended the protection of the doctrine of unseaworthiness to the same extent as a seaman is, the "other equipment" argument would fail in his case as well. Indeed, in *Grillea,* the successful libelant was a longshoreman.

In Mosley v. Cia. Mar. Adra, S. A., 314 F.2d 223 (2d Cir.), cert. denied, 375 U.S. 829, 835, 84 S.Ct. 73, 11 L.Ed.2d 61 (1963), two members of the court of appeals of this circuit agreed that a ship could be unseaworthy because of improper lighting in the hold, where plaintiff longshoreman was loading cargo, even though adequate portable lights were available on board.[7] This view was reinforced recently by Waldron v. Moore-McCormack Lines, Inc., 356 F.2d 247, 250–51 (2d Cir. 1966), where the court said in dictum:

> It is with respect to the ship's gear, equipment and appliances that the most significant developments along liberal lines have taken place. *It now makes no difference that other safe gear was available but not used.* See, e. g., Mahnich v. Southern S. S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. Shore workers, including longshoremen and others performing tasks traditionally the work of seamen, became entitled to the benefits of the warranty of seaworthiness. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. And the doctrine has been applied to them even if the defective gear was supplied by the stevedore who brought it aboard ship. See, e. g., Alaska S. S. Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, affirming 205 F.2d 478 (9 Cir., 1953). *Even if the gear or appliances were not defective, a maladjustment might make them dangerous and the vessel could be found unseaworthy.* Crumady v. The Joachim Hendrick Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413. So also with a stuck valve that could only be "broken" by the use of tools or several men working together. American President Lines, Ltd. v. Redfern, 9 Cir., 1965, 345 F.2d 629. So also with a portable aluminum ladder leading to the hold which slipped out of place and fell due to the movement of the ship, despite the fact that an officer had placed a man to hold it and had told him to keep watch over it. Reid v. Quebec Paper Sales & Transp. Co., 2 Cir., 1965, 340 F.2d 34. Other instances of dangerous conditions caused by defects in, *or analogous improper use of,* various types of gear and equipment could be multiplied.[8]

Under the circumstances, then, the fact that a toggle bridle was available to the longshoreman does not require a finding that the ship was seaworthy.

---

7. Judge Marshall, in an opinion concurred in by Judge Friendly, reversed a verdict for plaintiff because an alternative theory of unseaworthiness had erroneously been submitted to the jury. Judge Clark, dissenting, argued that both theories, including the claim of inadequate lighting, were sufficient to sustain the verdict of unseaworthiness. Both Judge Clark and Judge Marshall agreed that a finding of unseaworthiness based upon inadequate lighting alone would have been sustained. Judge Friendly, concurring in the reversal, would not have found unseaworthiness because of inadequate lighting in the hold unless there was a showing that the ship did not have adequate portable lights at the disposal of the stevedores, citing Mollica v. Compania Sud-Americana de Vapores, 202 F.2d 25 (2d Cir.), cert. denied, 345 U.S. 965, 73 S.Ct. 952, 97 L.Ed. 1384 (1953), and Ezekiel v. Volusia S.S. Co., 297 F.2d 215, 91 A.L.R.2d 1013 (2d Cir. 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962).

8. (Emphasis added; footnote omitted.) There was a dissent in *Waldron,* but it is clear that all three judges (Medina, Lumbard and Smith) agreed on the dictum. E. g., the dissent (per Smith, J.) rejected a defense to unseaworthiness "that the vessel had available safe equipment which was not used." 356 F.2d at 253.

## II

After the one-ton beam hit him on the morning of February 19, 1961, plaintiff was knocked unconscious and was taken off the ship on a stretcher. One witness testified that plaintiff appeared to be dead. Thereafter, with the exception of a few days, plaintiff was hospitalized until the end of March.

The preponderance of evidence shows that plaintiff suffered severe injuries as a result of the accident. A cerebral concussion was incurred, leading to recurrent headaches, severe dizziness and asthenopia (eye fatigue). It further appears that plaintiff suffers from hypersensitivity on his forehead. An examining neurologist, Dr. Ralph A. Olson, felt that all of these conditions were a permanent residual of the concussion. Shipowner attempted to explain away some of plaintiff's complaints generally as the result, not of an underlying organic neurological involvement, but of conversion hysteria, defined as an emotional disorder in which anxiety is unconsciously converted into physical symptoms. Since the conversion hysteria, if any, followed the accident and there is no evidence that the hysteria was caused by something other than the accident, this "explanation" is meaningless insofar as assessment of damages is involved. No argument is made by defendant that "imagined" pain is less uncomfortable than "valid" pain.

Turning to injuries not relating to the nervous system as such, Dr. Harry Sherman, an orthopedic surgeon, testified that plaintiff incurred, due to the accident, scars on his head and chin, a nose deformity and fracture of nasal bones, crepitus (grating) and pain when his neck moves, a bony elevation of the collar bone, atrophy of the shoulder muscles and consequent loss of movement in abduction and flexion, and restriction of trunk motion. These injuries are permanent, and the left arm will never be able to be used for physical exertion. Plaintiff also suffered multiple lacerations of the nose and forehead and fractures of the clavicle, rib and scapula.

Shipowner's witness, Dr. Balensweig, agreed that there was "mild" atrophy of the left shoulder and that plaintiff could not go back to work as a carpenter. Finally, plaintiff testified he had suffered a great deal of pain, as might be the expected result of this accident.

Plaintiff was forty-seven years old at the time of the accident; he is now about fifty-three. The parties stipulated that plaintiff's work-life expectancy would be to age sixty-five, and his life expectancy would be 27.1 years as of the date of the accident. Plaintiff's average annual earnings over the last six years that he worked, based on stipulated figures, were $3,693. Although plaintiff clearly has proved an inability to continue in the occupation he had engaged in at the time of the accident, the issue of how much earning capacity plaintiff has been deprived of remains.

The general principle is easily stated. The objective is to place the libelant in the same economic position as would have been his if the injury had not occurred. We seek to accomplish this goal by a formula which, stated in an oversimplified form, consists of determining what libelant's annual earning power would have been but for the injury, deducting what it will be thereafter, multiplying the result by libelant's expectancy, and discounting the product to present value. We recognize the delusive exactness of all this since, among other defects, life expectancies are averages and the formula assumes what we know to be usually contrary to the fact, namely, that the injured party will be fully employed; but it is the best we have. Difficulties come in applying the formula to a specific case * * *.

Conte v. Flota Mercante del Estado, 277 F.2d 664, 669 (2d Cir. 1960). The burden of proving damage and damages is, of course, on plaintiff, as well as the duty to mitigate damage. Puggioni v. Luckenbach S. S. Co., 286 F.2d 340, 344 (2d Cir. 1961); Litwinowicz v. Weyerhaeuser S. S. Co., 179 F.Supp. 812, 824 (E.D.Pa.1959).

In this action plaintiff is not demonstrably unemployable. Of course, the court must consider such factors as age and lack of varied experience. Nonetheless, the conclusion that labor is now entirely foreclosed to Candiano is unwarranted on the facts in this case. For the first year after his accident, I conclude that plaintiff was unable to work at all. Thereafter, plaintiff should have been able to, and will be able to, average one-third of his former earnings as a carpenter in some other line of endeavor. Two-thirds of plaintiff's average earnings before the accident is $2,462. About five years have elapsed since the accident, for a total loss of past earnings of $13,541 (one year at $3,693 and four years at $2,462). Plaintiff has asked for pre-judgment interest. Taking into account the uncertainty over the extent of his employability and the fact that no deduction, in my discretion, is being made for income taxes, I decline in the exercise of discretion in this admiralty case to award pre-judgment interest, as requested by plaintiff.[9] Plaintiff has a stipulated work expectancy of about twelve more years for a total of lost future earnings (12 times $2,462) of $29,544. In the exercise of discretion, future earnings will be discounted at four per cent, Alexander v. Nash-Kelvinator Corp., 271 F.2d 524, 527 (2d Cir. 1959), producing $23,118 for loss of future earnings.[10] Plaintiff proved medical and hospital expenses of $2,374.65. For pain and suffering, including permanent physical damage, I award slightly under $11,000, which makes a round figure of total damages of $50,000.

Shipowner alleged and had the burden of proving plaintiff's contributory negligence. Shipowner's claim is that Candiano unreasonably remained in the area in which beams were being lowered although he knew that the operation was in progress. It is true that Nuccio, a carpenter working with plaintiff, testified that shortly before the accident he ordered the carpenters in the hold, including Candiano, away from under the opening because the hold was to be covered up. This witness lacked credibility, however; e. g., he testified that he had discussed the case with nobody. Under all the circumstances, I find that Shipowner has not met its burden of demonstrating contributory negligence by plaintiff.

### III

Shipowner has a claim over for indemnity against Stevedore, based upon breach of Stevedore's warranty of workmanlike service. Mortensen v. A/S Glittre, 348 F.2d 383 (2d Cir. 1965); DeGioia v. United States Lines Co., 304 F.2d 421, 424 (2d Cir. 1962). Improper securing of the bridle in this case by longshoremen constituted a breach of this warranty, for which Shipowner is entitled to recover its judgment debt to plaintiff and its reasonable expenses of defending this action, including counsel fees and disbursements.

Accordingly, plaintiff's injuries were proximately caused by the unseaworthiness of the vessel and he is entitled to a judgment of $50,000 against Shipowner; the latter is entitled to a judgment in like amount, plus its reasonable expenses of defending the action, against Stevedore. The foregoing constitute the required findings of fact and conclusions of law.

9. It is unnecessary to deal with Stevedore's argument (Post-Trial Brief, pp. 1–3) that pre-judgment interest should be denied to longshoremen who, under the terms of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., do not bear the cost of their medical treatment and can receive disability compensation, thus making inapplicable the rationale for pre-judgment interest stated in Petition of the City of New York, 332 F.2d 1006 (2d Cir.), cert. denied, City of New York v. Bernstein, 379 U.S. 922, 85 S.Ct. 277, 13 L.Ed.2d 335 (1964).

10. 1 Committee on Pattern Jury Instructions—Ass'n of Supreme Court Justices, New York Pattern Jury Instructions—Civil 570 (1965).