733 F.Supp. 14 (1990)
In the Matter of the Complaint of The CONNECTICUT NATIONAL BANK, Trustee, as Owner; General Electric Credit Corporation, as Sole Beneficiary of Grantor Trust; 660 Leasing Company, as Bareboat Charterer; Connecticut Transport, Inc., as Owner pro hac vice and Bareboat Subcharterer of S/S OMI YUKON, for Exoneration from or Limitation of Liability, Plaintiffs.
HAWAIIAN INDEPENDENT REFINERY, INC., and Pacific Resources, Inc., Claimants and Third-Party Plaintiffs,
v.
OMI CORP., Third-Party Defendant.
OMI CORP., Third-Party Defendant and Fourth-Party Plaintiff,
and
The Connecticut National Bank, et al., Plaintiffs and Fourth-Party Defendants,
v.
CALEB BRETT U.S.A. INC., Fourth-Party Defendant.
No. 86 Civ. 8358 (RLC).
United States District Court, S.D. New York.
March 16, 1990.
*15 Livingston & Weiss, P.C., San Francisco, Cal., for claimant Duffy; William E. Weiss, of counsel.
William M. Kimball, New York City, for plaintiffs and third-party defendant, Connecticut National Bank, et al. and OMI Corp.
Freehill Hogan & Mahar, New York City, for fourth-party plaintiff; John J. Walsh, of counsel.
Cadwalader Wickersham & Taft, New York City, for claimants and third-party plaintiffs; Hawaiian Independent Refinery and Pacific Resources, Inc.; William L. Busch, Theodore A. Ulrich, of counsel.
ROBERT L. CARTER, District Judge.
On October 25, 1986, the S/S OMI YUKON commenced a voyage from Barber's Point, Hawaii en route to Pusan, Korea. On October 28, 1986, explosions and fires on the vessel killed four crew members and injured others. After being towed to Japan, the vessel was declared a constructive total loss. The vessel was owned by the Connecticut National Bank ("CNB") as trustee for General Electric Credit Corp. ("GECC"), both Connecticut corporations, bareboat chartered to 660 Leasing Corp. ("Leasing"), a Pennsylvania corporation, and sub-bareboat chartered to Connecticut Transport, Inc. ("CTI"), a New York corporation. The above party plaintiffs commenced this proceeding pursuant to 46 U.S. C.App. § 183 (1958 & Supp.1989) seeking exoneration from, and limitation of, liability for the disaster. Plaintiffs have asserted claims against Hawaiian Independent Refinery, Inc. ("HIF") and Pacific Resources, Inc. ("PRI") for contribution and independent liability. In due course, some 18 personal injury and death claimants filed claims and answers, as have HIRI, PRI and Caleb Brett. All of the personal injury and death claims have been settled, except the claim of Louanna Duffy, individually and as the personal representative of the estate of James W. Duffy, deceased, a former member of the OMI Yukon crew who was killed by the explosion on October 28, 1986.
The Duffy claim under the Death on the High Seas Act, 46 U.S.C.App. § 761 et seq. (1958), was tried to the court on December 18, 1989. The decedent, a qualified member of the engine department ("QMED") was 52 years old at the time of his death, with a life expectancy of 23.4 years[1] and a work life expectancy of 10.8[2] years. He married in 1963, and the surviving spouse was 67 years of age at the time of trial and in retirement since February, 1987, from employment with the Navy. The decedent earned $25,418 in 1980; $30,423 in 1981; $44,298 in 1982; $64,525 in 1983; $64,727 in 1984; $17,092 in 1985; and $17,550 in 1986. The low earnings in 1985 and 1986 were the result of his being required to stay home to take care of his wife who had broken her hip in 1985, requiring a hip replacement and two hip operations. In addition, Duffy's invalid mother-in-law required care as well.
During the periods when the decedent was employed, he worked 7 days a week 12 hours a day. When steadily employed his schedule was 56 days at sea and 6 days at home. During his periods at home, he cooked and cleaned when his wife worked, did all the electrical work, trimmed hedges, did necessary painting and repaired all the appliances. The Duffys have no children.
Louanna Duffy testified as to the above facts which have not been controverted. In support of the claim an economist, Richard A. Palfin, with a Ph.D degree from the University of Hawaii testified to support a claim for damages in the sum of $586,825. *16 Dr. Palfin is the chief economist for Legal Economics Evaluations, Inc. which he characterized as "the nation's largest consulting firm specializing in litigation-type economics. ..." (T. 34). There was no other testimony.
My problem with Dr. Palfin's testimony is that he used abstract figures without reference to the actuality of the Duffy's situation. He calculated the decedent's household services based on information supplied by the United States Department of Agriculture for all males in a 1982 publication "Family Economics Review" (T. 80), and without reference to information on the subject supplied by the widow.
The approach to damages in situations such as this is pursuant to an oversimplified formula, but one which seeks to determine what the decedent's earning would have been had he survived in good health, multiplied by decedent's work life expectancy with the resultant dollar figure arrived at, then discounted to the present value. In this case an additional element of damages is an award for loss of services. The decedent performed services painting, repairing appliances, doing electrical workwhich the widow must now pay for. There were no funeral service expenses, and no damages for loss of nurture and guidance since there were no children. While Mrs. Duffy is entitled to the benefit of any inheritance from her husband, no claim for such has been made, other than for loss of income and services since decedent's death.
Decedent has made a claim for pain and suffering. Although the court is sympathetic to that claim, the controlling case law appears to deny such recovery under the circumstances of decedent's death. Great Northern R.R. Co. v. Capital Trust Co., 242 U.S. 144, 147, 37 S.Ct. 41, 42, 61 L.Ed. 208 (1916); St. Louis-Iron Mountain R.R. v. Craft, 237 U.S. 648, 655, 35 S.Ct. 704, 705, 59 L.Ed. 1160 (1915). The explosion which caused Duffy's death occurred in the engine room and according to the National Transportation Safety Board
it is clear that explosion forces removed the top of the engine room casing ... Unfortunately, the time sequence of the explosion(s) manifestations could not be unequivocally determined from surveys after the accident or from the testimony of witnesses.
However, it is clear that multiple explosions (up to three) occurred. Testimony of various crew members described the first explosion as a rumbling sound low in the engine room similar to the sensation of the vessel running aground. Another crew member described it as a "whoom" rather than a sharp explosion. The "rumbling" description is postulated to be the result of the flame/explosion propagating through the starboard fuel oil storage tank from aft to forward. The first step in this process is postulated to have been the ignition of vapors venting from the aft vent on the starboard fuel oil storage tank. Second, the flame propagated back through the vent which did not have a flame screen into the space above the fuel oil. Inside the storage tank in the immediate vicinity of the vent, the fuel oil vapors were quite lean leading to the rumbling or pressure build-up phase as the combustible mixture undergoes a low order explosion that propagates forward into a volume containing a richer hydrocarbon mixture. The flame propagation would simultaneously develop more vapors and more energy as it progresses forward. The progression of the flame from aft to forward in the starboard oil storage tank would have led to an increasing pressure build-up that rapidly exceeded the capacity of the two vents, and an explosion would have occurred which could be characterized as a rumbling sound and a `whoom' as the tank structure failed and vented into the engine room.
Report of the National Transportation Safety Board, Claimant Duffy's Ex. 7, at 44.
In order to recover for pain and suffering there must be evidence that the decedent was actually conscious between the time of his injury and death. Absent such evidence an award for pain and suffering is *17 inappropriate. The Corsair, 145 U.S. 335, 12 S.Ct. 949, 36 L.Ed. 727 (1892).
There is no necessity for eyewitness testimony to validate an award for pain and suffering, Petition of United States Steel Corp., 436 F.2d 1256, 1275 (6th Cir.), cert. denied, 402 U.S. 987, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1970), but there were survivors to describe the "rumbling sound" and a "whoom" which preceded the explosion and inflammation that destroyed the engine room and caused the decedent's death.
Nor do the cases require any particular period of consciousness in order to validate an award for pain and suffering. Stissi v. Interstate & Ocean Transport Co., 590 F.Supp. 1043, 1048-49 (E.D.N.Y.1984), rev'd in part on other grounds, 765 F.2d 370 (2d Cir.1985) (an award for pain and suffering prior to cardiopulmonary arrest due to drowning was allowed). In Cook v. Ross Island Sand and Gravel Co., 626 F.2d 746, 750-752 (9th Cir.1980), an award for pain and suffering was allowed on testimony of a medical expert who testified that since the autopsy produced no evidence of skull fracture, it was probable that the decedent in his fall into the Columbia River was conscious for up to two and one half minutes. There could have been a period of consciousness between the rumbling sound and the whoom before decedent was engulfed in flames, but it is also equally possible the pain and suffering could have been "substantially contemporaneous with death or mere incidents to it," Great Northern R.R. Co. v. Capital Trust Co., 242 U.S. 144, 37 S.Ct. 41, 61 L.Ed. 208 (1916); St. Louis-Iron Mountain R.R. v. Craft, 237 U.S. 648, 655, 35 S.Ct. 704, 705, 59 L.Ed. 1160 (1915), in which case there can be no award for pain and suffering. One can only surmise which scenario accurately fits this case, and since "instantaneous death is as acceptable as any other theory," recovery for conscious pain and suffering will not be allowed. Marine Sulphur Transport Corp., 1974 A.M.C. 1504, 1511 (S.D.N.Y.1974) (Cannella, J.).
The decedent's earnings from 1980 show a steady rise, to 1984, but the years 1985 and 1986 are sharply down. The future earnings profile has been arrived at by utilizing an average of earnings for the six years preceding the accident. Candiano v. Moore-McCormack Lines, Inc., 251 F.Supp. 654, 660 (S.D.N.Y.1966) (Feinberg, J.). The formula was approved on appeal sub silentio, 382 F.2d 961 (2d Cir.1967), cert. denied, 390 U.S. 1027, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968). Although the holding was affirmed, I am not as confident as defendants appear to be that averaging the decedent's income for six years immediately prior to injury or death to determine future earnings is the rule of this circuit. In this area, the Court of Appeals appears to grant a great deal of discretion to the trial court. See e.g. Taliercio v. Compania Empressa Lineas Argentina, 761 F.2d 126, 129 (2d Cir.1985) (rate of prejudgment interest in the sound discretion of the trial court). The formula in the Sixth Circuit is "the higher of the year immediately preceding the [accident] or the average of four years preceding it," unless the single year was high for abnormal reasons. Petition of United States Steel Corp., 436 F.2d 1256, 1275 (6th Cir.1970), cert. denied, 402 U.S. 987, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971).
To utilize the decedent's earnings for 1985 and 1986 as part of the equation seems grossly unfair. His income for those two years was abnormally low because he spent much of the time at home, taking care of his wife and mother-in-law, both of whom were incapacitated. A fair measure of his future anticipated income flow is probably reflected in the 1983 and 1984 figures of $64,525 and $64,727, respectively. While defendants point out the loss of seamen's jobs in the shipping industry in the United States, this downward cycle was in progress in 1983 and 1984 when the decedent earned his highest salary. Mrs. Duffy testified that "shipping had gotten fairly bad on the west coast and we were going to move. We always moved according to shipping or he would go and ship out, but I had to retire so we ... I stayed living in San Francisco until I could retire." (T. 10) Further on she testified about living in the New York area and indicated that they moved to various locations *18 "[w]here the shipping was best at the time in his rating." (T. 11)
However, a fairer measure would probably be an average of the four years of salary for 1981-1984 when the decedent earned $30,421, $44,298, $64,525 and $64,727. Those were the years of decedent's highest earnings, but except for family illness which kept him at home much of 1985 and 1986, it is fair to assume that his income for the last two years of his life would have been closer to the earnings reflected in 1981-1984, than to the 1980, 1985 or 1986 earnings.
The average of decedent's 1981-1984 salary for those years is $50,993. Deductions of $7,506 for federal income taxes[3] and $3,619 for FICA[4] leave a net after tax income of $39,988. Defendants suggest that 50% be deducted from that figure to arrive at the sum available for the widow. They have support for this approach in a number of decisions of this court. See e.g. Petition of Marina Mercante Nicaraguense, S.A., 248 F.Supp. 15, 28 (S.D.N.Y. 1965) (Weinfeld, J.), modified on other grounds, 364 F.2d 118 (2d Cir.1966), cert. denied, 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544 (1967) (after deductions for personal expenses and taxes where beneficiaries are wife and four children, 81% of the remainder for family; wife and three children, 75% of the remainder for family, wife and one child, 66 2/3 %, and where wife is sole beneficiary, she is entitled to receive 50% of decedent's salary); NYE v. A/S D/S Svendborg, 358 F.Supp. 142, 153 (S.D. N.Y.1973) (Gurfein, J.) (same formula applied); In the matter of Marine Sulphur Transport Corporation, 1974 A.M.C. 1504 (S.D.N.Y.1974) (Cannella, J.) (formula applied). In Marine Sulphur Transport, Judge Cannella made no deductions for federal taxes where income was below $25,000. In United States v. English, 521 F.2d 63, 72 (9th Cir.1975), the court found a deduction of 30% which included personal expenses and taxes, with the remainder allocated to a family, appropriate. However, it should be pointed out that the beneficiaries were a widow and five children. Thus, that formula is akin to that utilized by Marina Mercante Nicaraguense and cognate cases in this court.
In this case a 50% deduction to arrive at income available to the widow seems too high. Indeed, defendant seeks an additional 5% deduction from the net figure for personal expenses and then an additional 50% deduction to arrive at what is available for the widow. Decedent when employed full time was on a 56 days at sea and 6 days at home cycle. While at sea, no expenditures for food or travel were required, and with a home cycle of 6 days roughly six times a year, a deduction of approximately $10,000 for decedent's personal consumption and share of the common household seems adequate. Under these calculations approximately 52% of decedent's gross salary is available for the widow or $29,912 yearly. The total of that amount for 10.8 years[5] discounted at 2%[6] to arrive at the present value is $288,506.[7]
In addition, the decedent's widow is entitled to $11,077 for loss of services.[8] This figure is arrived at on the basis of the 56 days at sea, 6 days at home a year. This *19 comes to an average of 33 days a year at home where he performed servicespainting, repairing etc.
Defendants seek a setoff of $20,000 which is a death benefit received by the widow from the union. There is nothing in the record to indicate that this benefit was in any way attributable to defendants. It comes from an entirely independent source and is therefore not available to defendants as a setoff. Haughton v. Blackships, Inc., 462 F.2d 788, 790 (5th Cir.1972) ("employer-tortfeasor not entitled to mitigate damages by setting off compensation received by employee from an independent source."); Gypsum Carrier, Inc. v. Handelsman, 307 F.2d 525, 534 (9th Cir.1962) ("tortfeasor should not have benefit of payment to [decedent] which he did not make.").
The claimant seeks the value of various fringe benefits to decedent as additional damages. There is nothing in the record to show that there were benefits the widow would have received. Indeed, there is nothing in the record to show what these benefits were. Claimant's economist uses a percentage derived from Department of Agriculture figures without more. I find that approach too vague for reliability. Hence the claim for fringe benefits is disallowed.
Total recovery allowed claimant is $434,395. To recapitulate, damages allowed are broken down as indicted below.

wages: $29,912 for 10.8 years discounted
 at 2% $288,506
services: 33 days per year at 8 hours per 11,077
 day at $4.35 per hour for
 10.8 years, discounted at 2% $299,583
 ________
 Interest at 12% from October 28,
 1986 to January 26, 1990 (3.25
 years) $134,812
 ________
 $434,395

IT IS SO ORDERED.
NOTES
[1] United States Life Tables, 1979-80.
[2] Id.
[3] This figure was arrived at by using the 1989 Tax Table, figured for married persons using the standard deduction of $5,800 (because widow is over 65) and exemption of $4,000. No deduction was made for state or local tax. There was no evidence in the record to warrant deduction for these taxes. Indeed, defendants made allowance for federal income taxes and FICA taxes only on their submissions. See Ex. A, HIRI and PRI's Memorandum of Law.
[4] Figured using 1989 standards: 7.51% with a cutoff at $48,000.
[5] 10.8 work life expectancy of decedent based on United States Life Tables, 1979-80.
[6] In this circuit a 2% discount is suggested. Doca v. Marina Mercante Nicaraguense, S.A., 634 F.2d 30, 40 (2d Cir.1980), cert. denied, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981); McCrann v. United States Lines, Inc., 803 F.2d 771, 775 (2d Cir.1986).
[7] Decedent's net income available to widow after federal taxes, social security taxes and 25% personal consumption deducted for 10.8 years discounted at 2%.
[8] I have calculated services of 8 hours per day at $4.35 per hour (minimum wage) for 10.8 years, discounted at 2%.